THE STATE OF OHIO, APPELLEE, *v.* ORR, APPELLANT.

THE STATE OF OHIO, APPELLEE, *v.* SMITH, APPELLANT.

**[Cite as *State v. Orr* (2001), 91 Ohio St.3d 389.]**

(No. 00–408—Submitted January 10, 2001—Decided May 2, 2001.)

390

FRANCIS E. SWEENEY, SR., J. From June 8, 1998 through June 20, 1998, the city of Dayton operated a system of driver's license checkpoints designed to identify and remove unlicensed drivers and drivers with suspended licenses from the roads. The checkpoints were set up at various locations in Dayton, including major thoroughfares and "target enforcement areas" —districts characterized by problems of traffic and crime. Upon arrival at a checkpoint site, the police would set up reflective signs that warned drivers of the upcoming checkpoint. The checkpoints were staffed by anywhere between eleven and thirteen officers. Several police cruisers were also present at the checkpoints.

As cars entered the checkpoints, they would be stopped according to some pattern that varied according to the amount of traffic on the road. If traffic was particularly light, every car would be stopped. Drivers who were stopped at these checkpoints were immediately advised of the purpose of the checkpoint and were asked to produce their driver's licenses. Drivers who produced a valid license would have their licenses returned to them along with a pamphlet explaining the checkpoint program and thanking them for their cooperation. The length of detention for those possessing a valid driver's license was usually about forty-five seconds.

Drivers who were unable to produce a valid driver's license had their names, dates of birth, and Social Security numbers entered into the officers' computers to check whether they possessed a valid license. If the computer showed that a driver was properly licensed and was not wanted by the police for any reason, the driver would be given the pamphlet, thanked, and released back into traffic. This entire process would take an additional two minutes or so to complete. Drivers without a valid license were cited for the violation, which added approximately ten minutes to the overall length of detention.

On June 17, 1998, appellant Magus Orr was stopped at a driver's license checkpoint and cited for driving without a license in violation of R.C. 4507.02(A)(1). That same night, appellant Andre Smith was stopped at a driver's license checkpoint at another location. Smith was cited for driving without a license in violation of R.C. 4507.02(A)(1), operating a motorcycle without the required endorsement in violation of R.C. 4507.02(A)(3), driving with expired license plates in violation of R.C. 4503.21, and operating a motorcycle without a helmet—required for novice riders—in violation of R.C. 4511.53.

Both of the appellants pleaded not guilty. Each appellant also filed a motion to suppress, claiming that his seizure was unconstitutional under the Ohio and United States Constitutions and that all evidence obtained as a result of his seizure should be suppressed. The trial court granted appellants' motions to suppress. The court concluded that because the state had offered no evidence to suggest that the driver's license checkpoints were a necessary or effective means of promoting roadway safety, they constituted an unreasonable search and seizure under the Ohio and United States Constitutions. The state appealed the trial court's decisions to the Second District Court of Appeals. In a consolidated case, the court of appeals reversed the trial court, concluding that driver's license checkpoints are a reasonable method by which to deal with the public danger posed by unlicensed drivers. Orr and Smith filed a joint notice of appeal. The cause is now before this court upon our allowance of a discretionary appeal.

We are asked to decide whether Dayton's driver's license checkpoint program violated the search and seizure provisions of the Ohio and United States Constitutions. For the reasons that follow, we sustain the program's constitutionality.

The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 14, Article I of the Ohio Constitution, which contains language nearly identical to its federal counterpart, also prohibits unreasonable searches and seizures.[1] Because Section 14, Article I and the Fourth Amendment contain virtually identical language, we have interpreted the two provisions as affording the same protection. See *State v. Robinette* (1997), 80 Ohio St.3d 234, 238, 685 N.E.2d 762, 766–767. The search and seizure provisions of the Ohio and United States Constitutions are implicated in this case because a vehicle stop at a highway checkpoint constitutes a "seizure" within the meaning of the Ohio and United States Constitutions even though the purpose of the stop is limited and the resulting detention brief. *Delaware v. Prouse* (1979), 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667.

A number of federal and state courts have upheld the seizure of motorists at driver's license checkpoints. See, *e.g., United States v. McFayden* (C.A.D.C.

---

1. Section 14, Article I of the Ohio Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

1989), 865 F.2d 1306; *United States v. Prichard* (C.A.10, 1981), 645 F.2d 854; *LaFontaine v. State* (1998), 269 Ga. 251, 497 S.E.2d 367; *State v. Cloukey* (Me.1985), 486 A.2d 143; *State v. Grooms* (1997), 126 N.C.App. 88, 483 S.E.2d 445. Although the United States Supreme Court has never fully considered the constitutionality of a driver's license checkpoint, it has repeatedly suggested in *dicta* that it would uphold properly administered driver's license checkpoints. For instance, in *Prouse*, the United States Supreme Court held that the Fourth Amendment prohibits a police officer from arbitrarily stopping an automobile for the sole purpose of checking the driver's license and registration. The court stressed, however, that this holding did not preclude states from developing methods for spot checks, including the "[q]uestioning of all oncoming traffic at roadblock-type stops." *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673–674. Similarly, in *Indianapolis v. Edmond* (2000), 531 U.S. 32, ——, 121 S.Ct. 447, 457, 148 L.Ed.2d 333, 347, the Supreme Court invalidated drug interdiction checkpoints implemented primarily to uncover evidence of criminal wrongdoing but cautioned that its decision did nothing to alter the constitutional status of driver's license checkpoints.

The United States Supreme Court's cases generally accord more Fourth Amendment protection to persons who are subjected to roving-patrol stops than to those who are stopped at roadblock, or checkpoint-type, stops like that involved in the case at bar. The different treatment of checkpoint and roving-patrol stops makes sense, given the essential purpose underlying the Fourth Amendment. The Fourth Amendment "impose[s] a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions." ' " (Footnote omitted.) *Prouse*, 440 U.S. at 653–654, 99 S.Ct. at 1396, 59 L.Ed.2d at 667, quoting *Camara v. Mun. Court of San Francisco* (1967), 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935. The crucial distinction between roving-patrol stops and checkpoint stops is the degree to which they intrude upon motorists' privacy and sense of security. "[T]he subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *United States v. Martinez–Fuerte* (1976), 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116, 1128. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *United States v. Ortiz* (1975), 422 U.S. 891, 894–895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623, 628. Many motorists accept checkpoint stops as incidental to highway use. *Martinez–Fuerte*, 428 U.S. at 561, 96 S.Ct. at 3084, 49 L.Ed.2d at 1130, fn. 14.

In determining the constitutionality of a police checkpoint, courts evaluate the following three factors: (1) the particular checkpoint's intrusion on privacy, (2)

the state's interest in maintaining the checkpoint, and (3) the extent to which the checkpoint advances the state interest. *Michigan Dept. of State Police v. Sitz* (1990), 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412. The United States Supreme Court has relied upon this analysis in upholding sobriety checkpoints— roadblocks at which drivers are checked for being under the influence of alcohol or mind-altering drugs—and roadblocks designed to intercept illegal immigrants. See *id.* (sobriety checkpoints); *Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (immigration checkpoints). The courts of several jurisdictions have extended the analysis to cases involving driver's license checkpoints. See, *e.g.*, *McFayden*, 865 F.2d 1306; *Cloukey*, 486 A.2d 143. We agree with those jurisdictions that have concluded that the analysis employed by the United States Supreme Court in its cases on sobriety and immigration checkpoints is appropriate for review of driver's license checkpoints. Therefore, we hold that in determining the constitutionality of a driver's license checkpoint, a court must evaluate, on a case-by-case basis, the checkpoint's intrusion on privacy, the state's interest in maintaining the checkpoint, and the extent to which the checkpoint advances the state interest. Applying this three-pronged analysis, we find that Dayton's driver's license checkpoints were consistent with the search and seizure provisions of the Ohio and United States Constitutions.

Like most checkpoint stops, Dayton's driver's license checkpoints did not greatly intrude upon travelers' sense of privacy. Drivers approaching these checkpoints were warned in advance of their presence. At the checkpoint, drivers could see that they were not the only ones being stopped. Visible signs of the officers' authority were everywhere. Each checkpoint was manned by at least eleven officers, with police cruisers present. Drivers who were stopped were immediately advised of the purpose of the stop. Most of those possessing a valid license were sent on their way after only about forty-five seconds. Those who had a valid license but could not produce it at the checkpoint were dispatched after only a few minutes. Even those driving without a valid license were detained for only ten minutes or so. Every driver stopped at one of Dayton's driver's license checkpoints was given a pamphlet explaining the checkpoint program and thanking him or her for cooperating. Clearly, these checkpoints constituted a very limited intrusion into travelers' privacy and sense of security.

Weighing against this minimal intrusion on privacy is the state's vital interest in using driver's license checkpoints to identify unlicensed drivers. The state has an interest in ensuring that only those qualified to do so are permitted to operate motor vehicles and hence that licensing requirements are being observed. *Prouse*, 440 U.S. at 658, 99 S.Ct. at 1398, 59 L.Ed.2d at 670. "Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to

operate a motor vehicle." *Id.* See, also, R.C. 4507.11.[2] As the court of appeals noted, "Persons who are too young or too old to drive pose a threat to the public safety." *State v. Smith* (Jan. 14, 2000), Montgomery App. Nos. 17475, 17476 and 17477, unreported, at 24, 2000 WL 20882. "Persons who have had their licenses suspended for convictions of operating a motor vehicle while under the influence of alcohol often disregard their suspensions and drive anyway, endangering the public." *Id.* In short, the state has a critical interest in protecting its citizens from drivers who either are not qualified to drive or have been forbidden to drive because of a record of driving offenses.[3]

Compounding the danger to the public from unlicensed drivers is the fact that much of the danger is hidden from plain view. While many types of dangerous motorists—drunk drivers, for example—exhibit erratic driving, the unlicensed driver often displays no observable characteristics. *Cloukey,* 486 A.2d at 147. Police officers on roving patrol cannot pull over a vehicle for the sole purpose of checking the driver's license and registration. *Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. Therefore, without checkpoints, the only way in which police can identify an unlicensed driver is by waiting for the driver to commit a driving offense. *Cloukey,* 486 A.2d at 147. In at least some instances, the offense would not even have occurred had the offending driver been detected earlier and been removed from the roadways.

The final consideration in our three-pronged analysis is the extent to which the driver's license checkpoints advanced the state interest. This requires us to consider the Dayton program's effectiveness in identifying unlicensed drivers.

In one two-week period, the Dayton police stopped 2,110 motorists and issued 224 traffic citations, resulting in a citation rate of approximately 10.6 percent. By constitutional standards, this effectiveness rate of 10.6 percent is quite substantial. Although there was no evidence of how many of these citations were related to licensing, even if only a fraction of the citations were issued for driving without

---

2. R.C. 4507.11 provides:

 "The registrar of motor vehicles shall conduct all necessary examinations of applicants for temporary instruction permits, drivers' licenses, or motorcycle operators' endorsements. The examination shall include a test of the applicant's knowledge of motor vehicle laws, including the laws on stopping for school buses, a test of the applicant's physical fitness to drive, and a test of the applicant's ability to understand highway traffic control devices."

3. According to Dayton's Police Driver's License Checkpoint Guidelines, adopted in 1998, of the almost 3.2 million drivers in the state of Ohio, approximately 800,000 had their licenses under some form of suspension. The introduction to the guidelines states that, in 1998, when the city of Dayton established its checkpoint program, approximately thirty percent of the traffic citations issued by the Dayton Police Department were for driver's license violations. It also reports that an estimated one in eight drivers on the streets of Dayton either did not have a driver's license or were driving under suspension.

a valid license, the effectiveness rate in the case *sub judice* would still exceed rates sustained by the United States Supreme Court in analogous checkpoint cases. See *Sitz*, 496 U.S. at 455, 110 S.Ct. at 2487, 110 L.Ed.2d at 423 (1.6 percent arrest rate for drunk drivers); *Martinez–Fuerte*, 428 U.S. at 554, 96 S.Ct. at 3081, 49 L.Ed.2d at 1126 (apprehension of illegal aliens in 0.12 percent of vehicles passing through checkpoint).

In sum, assessing the checkpoints' intrusion on privacy, the state's interest in maintaining driver's license checkpoints, and the extent to which Dayton's checkpoint program advanced the state interest, we find that Dayton's driver's license checkpoint program was consistent with the search and seizure provisions of the Ohio and United States Constitutions. We affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur. COOK, J., concurs in judgment.

---

*Julia L. McNeil,* Dayton Director of Law, *John J. Scaccia,* Chief Administrative Counsel, and *Deirdre Logan,* Acting Chief Prosecutor, for appellee.

*Carl G. Goraleski* and *Anthony R. Cicero,* Assistant Public Defenders, for appellants.

*Betty D. Montgomery,* Attorney General, *David M. Gormley,* Associate Solicitor, and *David V. Patton,* Assistant Solicitor, urging affirmance for *amicus curiae* Attorney General of Ohio.

*Barry M. Byron, Stephen L. Byron* and *John Gotherman,* urging affirmance for *amicus curiae* Ohio Municipal Attorneys Association.

*Flanagan, Lieberman, Hoffman & Swaim* and *Richard Hempfling,* urging reversal for *amicus curiae* American Civil Liberties Union of Ohio Foundation.

IN RE APPLICATION OF BARILATZ.

[Cite as *In re Application of Barilatz* (2001), 91 Ohio St.3d 396.]

(No. 00–1652—Submitted January 10, 2001—Decided April 25, 2001.)

*Per Curiam.* In March 3, 1998, applicant, Michael J. Barilatz of East Cleveland, Ohio, filed a notice of appeal from a report of the Joint Admissions Committee of the Cleveland/Cuyahoga County Bar Association ("Joint Admissions Committee") disapproving his application to take the February 1998 examination for admission to the practice of law in Ohio.

The appeal was assigned to a panel of the Board of Commissioners on Character and Fitness of the Supreme Court ("board"), which began its hearing in September 1998. At this initial hearing, the panel found that the applicant had not in his application referred to, nor at the hearing produced, the Lake County Bar Association's 1997 disapproval of his earlier application for admission to the bar, that the applicant did not produce the letter to the Lake County Bar Association from applicant's ex-wife charging applicant with financial and criminal misconduct, and that the applicant could not document certain military awards he claimed to have received. The panel therefore requested that the applicant furnish additional information and that the Joint Admissions Committee further investigate applicant's qualifications.

After a hearing in June 2000, the panel concluded and recommended to the board that the applicant not be approved for admission to the practice of law in Ohio and that he not be allowed to reapply. The panel reached its conclusion after finding that applicant had failed to advise the Joint Admissions Committee of his previous rejection for admission to the bar by the Lake County Bar Association. The panel further found that the applicant failed to reveal and then adamantly denied being a Florida resident although he owned property and had a bank account in Florida, ran a business there, held a Florida real estate license, registered to vote there, had an automobile titled and licensed there, and held a Florida driver's license. The panel also found that applicant could not document the three Purple Heart medals he claimed to have received in the Vietnam War. Further, applicant had been jailed in 1992 and again in 1996 for failing to pay

child support, and his arrearage for child support in August 1998 amounted to $33,447.97. The panel also found that in July 1998 while working as a law clerk for a Cleveland attorney, he gave a municipal court judge the impression during a telephone hearing that he was a licensed attorney. In addition, the panel found that applicant did not inform the Joint Admissions Committee of his 1995 petition for habeas corpus for release from a ninety-day jail term for contempt of court. Finally, the panel found that in 1984, applicant was charged with carrying a concealed weapon, pled guilty to a reduced misdemeanor charge, and was fined $250. The panel believed that applicant's conduct, having occurred when he was in his forties, could not be ascribed to youth or inexperience, and that since applicant was now almost fifty years old, any change in his actions could not be expected.

The board adopted the findings, conclusions, and recommendations of the panel.

After review of the record, we adopt the findings, conclusions, and recommendation of the board. Applicant is hereby disapproved for admission to the practice of law, and he shall not be permitted to reapply for admission in the future. It is so ordered.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Michael J. Benza,* for the Joint Admissions Committee of the Cleveland/Cuyahoga County Bar Association.

*Mark Paul Glassman,* for applicant.

DAYTON BAR ASSOCIATION *v.* BRUNNER.

[Cite as *Dayton Bar Assn. v. Brunner* (2001), 91 Ohio St.3d 398.]

(No. 00–1564—Submitted December 12, 2000—Decided May 2, 2001.)

*Per Curiam.* On December 8, 1997, relator, Dayton Bar Association, filed a complaint charging that respondent, L. Keith Brunner of Dayton, Ohio, Attorney Registration No. 0006567, violated DR 1–102(A)(3) (a lawyer shall not engage in conduct involving moral turpitude) and 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). Respondent answered, admitting all the allegations of the complaint and asking that he be heard in mitigation. Thereupon the matter was referred to a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board").

Based on the stipulations of the parties and testimony at a hearing, the panel found that in 1984, Arthur Millonig, one of respondent's partners in a group known as the "Brunner Principals," arranged to purchase commercial real estate in Allen, Texas, from the owner, Securities Savings Association of Texarkana ("SSA"), for $13,200,000. The property was also subject to an $8,000,000 mortgage. At the time SSA had a number of troubled loans, but this property had appreciated from the time SSA acquired it and the profit from such a sale could bolster SSA's financial position.

Although federal regulations prohibited SSA from financing one hundred percent of the purchase price, SSA lent $2,600,000 to three Brunner Principals, not including respondent, who then lent the money to Millonig. Millonig in turn used the funds as his twenty percent down payment on the real estate. Millonig also gave SSA a second mortgage for $2,600,000 and assumed the $8,000,000 first mortgage. Millonig was thereby able to obtain financing for one hundred percent of the purchase price from SSA. Respondent was not involved in the transfer of the funds, but he was involved in structuring and orchestrating the transaction.

On March 22, 1996, respondent pled guilty to two counts of bank fraud in violation of Section 1344, Title 18, U.S.Code, and was sentenced to prison for forty-eight months and fined $10,000. He also pled guilty to conspiracy to commit tax fraud in violation of Section 371, Title 18, U.S.Code and was

sentenced to six months in prison, two years of supervised release, and fined $5,000. Special assessments were also imposed. Because of these felony convictions, we suspended respondent on December 19, 1996, for an interim period. *In re Brunner* (1996), 77 Ohio St.3d 1499, 673 N.E.2d 597.

Respondent was incarcerated in federal prisons from November 1996 through mid-July 1998. He then spent nine months at a halfway house and was subject to home confinement for three months. At the time of the panel hearing, respondent had completed all his prison terms, paid all his fines, and was employed as the Chief Operating Officer of a financial services company.

At the hearing, the relator withdrew the charge of a violation of DR 1–102(A)(3). The panel concluded that respondent violated DR 1–102(A)(4). In mitigation, the panel found that respondent cooperated with the federal investigation and recommended that he be indefinitely suspended from the practice of law with credit given for the time he served since the date of his interim suspension. The board adopted the findings, conclusions, and recommendation of the panel.

We have reviewed the record and adopt the findings, conclusion, and recommendation of the board. Respondent is hereby indefinitely suspended from the practice of law with credit given for the time he has served since the date of his interim suspension, December 18, 1996. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

———

*Patrick W. Allen*, for relator.

*Charles W. Kettlewell*, for respondent.

THE STATE EX REL. FRATERNAL ORDER OF POLICE, OHIO
LABOR COUNCIL, INC. ET AL. *v.* CITY OF SIDNEY.

[Cite as *State ex rel. Fraternal Order of Police, Ohio Labor Council, Inc. v. Sidney* (2001), 91 Ohio St.3d 399.]

(No. 00–1899—Submitted March 27, 2001—Decided May 16, 2001.)

*Per Curiam.* Relator John Frilling is a permanent public employee as defined in R.C. 5903.01(A) who is employed as a police lieutenant by respondent, the city of Sidney, Ohio, a chartered municipality. Frilling is a member of relator Fraternal Order of Police, Ohio Labor Council, Inc. ("FOP"), which is the exclusive representative of employees in the classifications of Communications Technicians, Patrol Officers, Sergeants, and Lieutenants for the Sidney Police Department. Frilling has also been a member of the United States Air Force Reserve and the Ohio Air National Guard.

Between December 23, 1996 and December 13, 1999, Sidney Ordinance No. 131.18 provided:

"MILITARY LEAVE.

"Any employee who is a member of the National Guard or militia or of the military or naval forces of the United States, and is required to undergo field training therein or is called for active duty, shall be granted a leave of absence with pay for the period. Vacation and sick leave shall only be accrued at the employee's regular rate during this paid leave. This paid leave of absence shall be in addition to his vacation leave, but shall not exceed fifteen days in any fiscal year. *In the case of military leave, paid leave shall mean the difference between the employee's regular salary and all government money received for such military leave, excluding any transportation reimbursement received.*" (Emphasis added.)

In December 1999, this ordinance was amended to provide for twenty-two days military leave in any calendar year.

In addition, the collective bargaining agreement between the FOP and Sidney contained a comparable military leave provision that provided that this leave shall not exceed fifteen days in any fiscal year and that paid military leave is "the difference between the employee's regular salary and all governmental money received for such military leave, excluding any transportation reimbursement received."

These provisions confer lesser benefits than R.C. 5923.05, which provides for military leave "without loss of pay" for permanent public employees. R.C. 5923.05(A). Effective September 18, 1997, R.C. 5923.05(F) was amended to provide that "[a]ny permanent public employee of a political subdivision whose

employment is governed by a collective bargaining agreement with provision for the performance of service in the uniformed services shall abide by the terms of that collective bargaining agreement with respect to the performance of such service, *except that no collective bargaining agreement may afford fewer rights and benefits than are conferred under this section.*" (Emphasis added.) 147 Ohio Laws, Part IV, 7806, 7875.

Since September 18, 1997, Frilling has been on requested leaves of absence from his job with Sidney while serving in the United States Air Force Reserve and the Ohio Air National Guard. According to Frilling, during these absences, Sidney did not grant him a leave of absence without loss of pay, and the city required him either to use his days off or use his accrued vacation or personal leave to cover his military absences. Frilling never provided evidence to the city that he had been called to military duty when he requested and received military leave.

In January 2000, Frilling attempted to schedule two days of military leave in addition to his eight unpaid, authorized days off. Sidney treated Frilling's military leave as paid personal days off, and Frilling filed a grievance under the grievance and arbitration procedure of the collective bargaining agreement. Neither the FOP nor Frilling pursued the grievance through the final step in the agreement, *i.e.*, arbitration.

In October 2000, the FOP and Frilling filed this action for a writ of mandamus to compel the city of Sidney to comply with R.C. 5923.05 by paying Frilling "his regular pay plus interest, irrespective of any pay he receives from the military, during his leaves of absence since September 18, 1997 while performing services in the uniformed services without requiring him to schedule his off days or benefit leave during these absences." After Sidney filed an answer in December 2000, the case was referred to mediation. In February 2001, the cause was returned to the regular docket.

This cause is now before the court for its S.Ct.Prac.R. X(5) determination.

We must now determine whether dismissal, an alternative writ, or a peremptory writ is appropriate. S.Ct.Prac.R. X(5); *State ex rel. Cleveland Elec. Illum. Co. v. Cuyahoga Cty. Court of Common Pleas* (2000), 88 Ohio St.3d 447, 449, 727 N.E.2d 900, 902. Dismissal is appropriate if it appears beyond doubt, after presuming the truth of all material factual allegations and making all reasonable inferences in favor of relators, that they are not entitled to the requested extraordinary relief. *State ex rel. Grendell v. Davidson* (1999), 86 Ohio St.3d 629, 632, 716 N.E.2d 704, 708.

Relying solely upon R.C. 5923.05, relators claim that Frilling must be paid his regular salary from Sidney in addition to his military pay while performing

military service without being required to schedule vacation leave during these absences. For the following reasons, relators' claim is meritless.

First, R.C. 5923.05 is inapplicable to Frilling's military leave because of the plain language of R.C. 4117.10. R.C. 4117.10(A) expressly states that absent an election by the city to provide the military leave specified in R.C. 5923.05, the provisions of the collective bargaining agreement prevail:

"*The law pertaining to the leave of absence and compensation provided under section 5923.05 of the Revised Code prevails over any conflicting provisions of [collective bargaining] agreements if the terms of the agreement contain benefits which are less than those contained in that section or the agreement contains no such terms and * * * the public authority* is another entity listed in division (B) of section 4117.01 of the Revised Code that *elects to provide leave of absence and compensation as provided in section 5923.05 of the Revised Code.*" (Emphasis added.)

Here, R.C. 5923.05 does not prevail over either the collective bargaining agreement or the Sidney ordinance. The city has *not elected* to provide the military leave and compensation specified in R.C. 5923.05. In fact, through its collective bargaining agreement and ordinance, Sidney has elected otherwise.

Second, R.C. 5923.05 is inapplicable because it conflicts with Sidney Ordinance No. 131.18. An ordinance adopted by a municipality pursuant to its constitutional home-rule authority regarding military leave of its employees prevails over conflicting state law. See *N. Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St.2d 375, 378, 15 O.O.3d 450, 452, 402 N.E.2d 519, 521–522 ("It is axiomatic that an ordinance, similar to the one at bar [regarding military pay], if enacted by a chartered municipality, would prevail over the state law [R.C. 5923.05] irrespective of any conflict"); *Mullen v. Akron* (1962), 116 Ohio App. 417, 22 O.O.2d 251, 188 N.E.2d 607; see, also, 2000 Ohio Atty.Gen.Ops. No. 2000–007, fn. 4.

Third, even assuming that R.C. 5923.05 conferred a legal right on Frilling to the requested military leave and compensation, relators failed to specifically allege that Frilling satisfied the statutory prerequisite for these benefits. R.C. 5923.05(E) mandates that each permanent employee entitled to this leave "*shall submit* to the permanent public employee's appointing authority *the published order authorizing the call or order to the uniformed services or a written statement from the appropriate military commander authorizing that service, prior to being credited with such leave.*" (Emphasis added.) S.Ct.Prac.R. X(4)(B) requires the pleading of specific facts in mandamus actions in this court rather than unsupported conclusions. *State ex rel. Taxpayers Coalition v. Lakewood* (1999), 86 Ohio St.3d 385, 390, 715 N.E.2d 179, 184. Relators'

complaint does not contain even conclusory allegations regarding compliance with the R.C. 5923.05(E) statutory requirement.

Finally, to the extent that relators might claim that they are entitled to relief under the parties' collective bargaining agreement, they have or had an adequate legal remedy through the agreement's grievance and arbitration procedure. *State ex rel. Zimmerman v. Tompkins* (1996), 75 Ohio St.3d 447, 449, 663 N.E.2d 639, 641.

Based on the foregoing, it appears beyond doubt that relators' action lacks merit, and it is dismissed.

*Cause dismissed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

PFEIFER, J., dissents and would grant an alternative writ.

———

*Paul L. Cox* and *Kay E. Cremeans,* for relators.

*Denlinger, Rosenthal & Greenberg Co., L.P.A., Robert M. Lamb* and *Daniel G. Rosenthal,* for respondent.

THE STATE EX REL. STOVALL, APPELLANT, *v.* JONES, JUDGE, APPELLEE.

[Cite as *State ex rel. Stovall v. Jones* (2001), 91 Ohio St.3d 403.]

(No. 00–2008—Submitted March 13, 2001—Decided May 16, 2001.)

———

***Per Curiam.*** In July 2000, appellant, A.J. Stovall, filed a complaint in the Court of Appeals for Cuyahoga County for a writ of mandamus to compel appellee, Cuyahoga County Court of Common Pleas Judge Peggy Foley Jones, to vacate Stovall's 1994 criminal conviction and sentence, which she allegedly used to enhance Stovall's 1997 criminal conviction and sentence. Stovall claimed that

Judge Jones patently and unambiguously lacked jurisdiction to try and convict him in the 1994 case without a knowing, intelligent, and voluntary guilty plea, and without a signed jury waiver pursuant to R.C. 2945.05. Judge Jones filed a motion for summary judgment. In October 2000, the court of appeals denied the writ.

This cause is now before the court upon an appeal as of right.

Stovall asserts that the court of appeals erred in denying the writ. For the following reasons, Stovall's assertions lack merit.

Stovall had adequate legal remedies, *e.g.*, a motion to withdraw his guilty plea and an appeal to raise his claim that he did not knowingly, intelligently, and voluntarily plead guilty in 1994. See, *e.g.*, *State ex rel. Tran v. McGrath* (1997), 78 Ohio St.3d 45, 47, 676 N.E.2d 108, 109; *State ex rel. Seikbert v. Wilkinson* (1994), 69 Ohio St.3d 489, 491, 633 N.E.2d 1128, 1130; Crim.R. 32.1.

Further, a claimed violation of the jury-trial waiver requirements of R.C. 2945.05 may be remedied only in a direct appeal from a criminal conviction. *Bradford v. Moore* (2000), 90 Ohio St.3d 75, 734 N.E.2d 828, 829; *State v. Pless* (1996), 74 Ohio St.3d 333, 658 N.E.2d 766, paragraph two of the syllabus.

Based on the foregoing, we affirm the judgment of the court of appeals.[1]

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*A.J. Stovall*, pro se.

*William Mason*, Cuyahoga County Prosecuting Attorney, and *Renee L. Snow*, Assistant Prosecuting Attorney, for appellee.

---

1. The court of appeals reasoned that denial was warranted because Stovall was using mandamus to effect his release from prison, and habeas corpus was thus the appropriate remedy. See *State ex rel. Carter v. Ohio Adult Parole Auth.* (2000), 89 Ohio St.3d 496, 733 N.E.2d 609. It is unclear, however, from the face of the petition if Stovall in fact requested his release from prison. Instead, it appears that he sought vacation of only his 1994 conviction and not his 1997 conviction. Nevertheless, even if the court's rationale was incorrect, its judgment denying the writ was appropriate. See *State ex rel. Fattlar v. Boyle* (1998), 83 Ohio St.3d 123, 125, 698 N.E.2d 987, 989 ("a reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as a basis thereof").

THE STATE EX REL. KEITH, APPELLANT, *v.* CORRIGAN, JUDGE, APPELLEE.

[Cite as *State ex rel. Keith v. Corrigan* (2001), 91 Ohio St.3d 405.]

(No. 00–2142—Submitted March 13, 2001—Decided May 16, 2001.)

*Per Curiam.* On April 28, 2000, appellant, Jeffrey C. Keith, filed a document in the Cuyahoga County Court of Common Pleas entitled "motion for declaratory judgment to vacate void judgments, motion to have the Chief Justice appoint judge, motion to convey or in the alternative tele-conference hearing requested." On June 6, the Chief Justice of the Supreme Court of Ohio denied an affidavit filed by Keith seeking to disqualify all Cuyahoga County judges from presiding over the case. On June 21, appellee, Cuyahoga County Common Pleas Court Judge Brian J. Corrigan, granted a motion filed by certain defendants named in Keith's action for leave to file a response to Keith's motions. The phrasing of this entry was subject to misinterpretation. Keith asserted that the entry in fact granted his motion to have the Chief Justice appoint a judge. On August 3, Judge Corrigan corrected the docket to clarify his order of June 21. Keith then filed a motion to void the proceedings and judgments by Judge Corrigan after June 22, 2000. On July 26, Judge Corrigan denied Keith's motion.

On August 21, Keith filed a complaint in the Court of Appeals for Cuyahoga County for a writ of mandamus to compel Judge Corrigan to void his rulings made after June 22 and to notify the Chief Justice of the Supreme Court of Ohio to select his replacement. Judge Corrigan filed a motion for summary judgment. In October 2000, the court of appeals granted Judge Corrigan's motion and denied the writ.

This cause is now before the court upon an appeal as of right.

We affirm the judgment of the court of appeals. Notwithstanding Keith's claims to the contrary, Judge Corrigan never recused himself from the case. In addition, the Chief Justice denied Keith's affidavit to disqualify Judge Corrigan and other Cuyahoga County judges from presiding over his case. Therefore, the court of appeals properly held that Keith was not entitled to the requested extraordinary relief.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Jeffrey C. Keith, pro se.*

*Kenneth J. Fisher Co., L.P.A.,* and *Kenneth J. Fisher,* for appellee.

THE STATE EX REL. STATON, APPELLEE, *v.* INDUSTRIAL
COMMISSION OF OHIO ET AL., APPELLANTS.

**[Cite as *State ex rel. Staton v. Indus. Comm.*
(2001), 91 Ohio St.3d 407.]**

(No. 99–1106—Submitted February 27, 2001—Decided May 23, 2001.)

*Per Curiam.* Appellee-claimant, Larry O. Staton, alleged that on April 26, 1993, he received an electrical shock at work. No one witnessed the incident. Despite his assertion that the shock was strong enough to render him unconscious, no one saw claimant in a disoriented, incapacitated, or unconscious state. To the contrary, claimant finished the work day and apparently left without mentioning the incident to anyone.

The following day, claimant reported the incident to his employer, appellant McDonnell Douglas Corporation. Claimant complained of neck and shoulder soreness to the plant physician. No treatment was recommended and claimant returned to work. No further complaints were made to the company doctor's office, and there is no other evidence of treatment. Over McDonnell Douglas's objections, a workers' compensation claim was eventually allowed for cervical and bilateral shoulder strain.

On May 3, 1993, claimant took a medical leave of absence that ultimately extended into a permanent retirement. Supporting documents from claimant's attending physician, Dr. Joseph Lutz, dated August 30, 1993, November 15, 1993, December 30, 1993, and January 27, 1994, all list coronary artery disease and depression as the sole reasons for claimant's retirement. Neither condition is allowed in this claim.

On December 6, 1996, claimant moved for permanent total disability compensation ("PTD"), but it does not appear as if claimant submitted any supporting medical evidence. On April 24, 1997, claimant was examined on the issue by

commission neurologist Dr. Kottil W. Rammohan. Dr. Rammohan opined that claimant's allowed condition had not reached maximum medical improvement ("MMI"), and suggested physical therapy and "work hardening." He also stated that claimant would probably never be able to function in his former job as a machinist.

Dr. Rammohan's report precipitated two things. First, it generated an interlocutory order from appellant Industrial Commission of Ohio holding claimant's PTD application in abeyance due to the temporary nature of claimant's condition. It also prompted claimant to move for temporary total disability compensation ("TTD"). Claimant accompanied that motion with an August 22, 1997 document from Dr. Lutz.

A district hearing officer initially denied TTD after rejecting Lutz's report as unpersuasive and rejecting Rammohan's report as defective on procedural grounds. A staff hearing officer ("SHO") reversed, and awarded TTD from April 24, 1997, through September 5, 1997, and to continue upon submission of medical proof. The commission, in turn, vacated the SHO and denied TTD, writing:

"[C]laimant has failed to meet his burden of proving by the preponderance of the medical evidence that the period of temporary total disability compensation requested (from April 24, 1997 and continuing) and the medical treatment requested * * * are causally related to the allowed conditions in the claim. In support of his Motion, the claimant has submitted the C–84 which was signed by Joseph Lutz, M.D. on August 22, 1997. Dr. Lutz does not indicate in this report what currently treated allowed conditions prevent the claimant from returning to work. Instead, Dr. Lutz diagnoses the claimant with 'coronary artery disease' as well as other conditions that are not allowed in the claim (i.e., 'myalgia-myositis' and 'cervical radiculopathy'). Dr. Lutz, in his clinical findings, notes that the claimant has 'chest pain with exertion,' which finding is consistent with his earlier diagnosis of coronary artery disease. Nowhere in this C–84 does Dr. Lutz indicate that the allowed cervical and bilateral muscle strain is at all responsible for the claimant's inability to return to his former position of employment. A later filed C–84, which was signed by Dr. Lutz on October 23, 1997, specifically attributes the claimant's inability to return to his former position of employment only to 'coronary artery disease' 'myalgia-myositis' and 'cervical radiculopathy.' Finally, the Industrial Commission finds that no narrative report has been submitted by claimant in support of the October 21, 1997 C–86 Motion and there is no explanation by Dr. Lutz why an MRI and EMG are necessary to treat this nearly five-year-old muscle strain and not the nonallowed conditions listed on the C–84. As such, the claimant has failed to support his C–86 motion with appropriate proof.

"The Industrial Commission further finds that the claimant's retirement from his former position of employment was not due to any condition other than the claimant's nonallowed coronary artery disease. The Industrial Commission finds that, after receiving the electrical shock which resulted in the allowed conditions in the claim, the claimant was able to return to work without missing any time. The claimant worked an additional week and then immediately went on medical disability due to his chronic heart problems and depression. There is no indication in the claim file that claimant received ongoing treatment for his allowed conditions while on disability leave. This finding is based on the October 18, 1993 letter sent by Rosalie Kay (Human Resources Administrator for the employer) and the various medical reports on file diagnosing the claimant with coronary artery disease."

Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County alleging that the commission abused its discretion in denying TTD. The magistrate observed that the tenor of the commission's order implied that Dr. Rammohan's report was not considered. However, because the commission's decision was supported by "some evidence," the magistrate found that the nonconsideration was harmless. The full appellate court, on the other hand, found the declaration of "some evidence" to be premature, given the nonconsideration of Rammohan's report. It instead returned the cause to the commission for consideration of Rammohan's report, "since it might have a bearing on the question about whether or not Mr. Staton voluntarily retired solely due to his coronary artery disease."

This cause is now before this court on appeal as of right.

The February 19, 1998 Industrial Commission order gave two reasons for TTD denial—lack of medical evidence and voluntary retirement. Dr. Rammohan, however, established baseline TTD eligibility by certifying that claimant's allowed condition had not reached MMI and prevented a return to the former position of employment. Consequently, the commission's finding that "no narrative report has been submitted by claimant in support" has produced a consensus that Dr. Rammohan's report was overlooked by the commission on appeal. The issue is whether nonconsideration is fatal.

Appellants maintain that it is not, arguing that claimant's retirement renders the medical issue moot. Claimant disagrees and asserts that his TTD eligibility has been preserved. The court of appeals found that the controversy hinged on the character of claimant's retirement, felt that consideration of Dr. Rammohan's report might clarify the issue, and returned the cause.

The character of retirement is indeed relevant because if injury-related, it is involuntary and cannot bar TTD. *State ex rel. Rockwell Internatl. v. Indus.*

*Comm.* (1988), 40 Ohio St.3d 44, 531 N.E.2d 678. If it is not injury-related, the result may be different.

For years, voluntary departure from employment was the end of the story, and harsh results sometimes followed. Claimants who left the former position of employment for a better job forfeited TTD eligibility forever after. In response, *State ex rel. Baker v. Indus. Comm.* (2000), 89 Ohio St.3d 376, 732 N.E.2d 355, declared that voluntary departure *to another job* no longer barred TTD. It retained, however, the prohibition against TTD to claimant's who voluntarily abandoned the *entire labor market.* Thus, the claimant who vacates the work force for non-injury reasons not related to the allowed condition and who later alleges an inability to return to the former position of employment cannot get TTD. This, of course, makes sense. One cannot credibly allege the loss of wages for which TTD is meant to compensate when the practical possibility of employment no longer exists.

In this case, claimant retired from the work force in 1993.[1] All relevant retirement documentation from his attending physician listed claimant's nonallowed heart condition and depression as the reasons for departure. Appellants cite this as "some evidence" that claimant's work-force retirement was due to causes other than industrial injury, barring TTD.

The court of appeals found that any evidentiary review was premature, given that Rammohan's report may not have been considered. This conclusion is tenuous.

As a general rule, a cause is returned to the commission when it is clear that evidence has been overlooked. *State ex rel. Fultz v. Indus. Comm.* (1994), 69 Ohio St.3d 327, 631 N.E.2d 1057. *Fultz* was motivated by the concern that a different result might have been reached if the commission had considered the omitted evidence. There is, however, an exception. Where the omitted evidence "is incapable of supporting a result contrary to that already reached by the commission," failure to consider it is not fatal and the cause will not be returned. *State ex rel. Shields v. Indus. Comm.* (1996), 74 Ohio St.3d 264, 268, 658 N.E.2d 296, 299.

In the case at bar, Dr. Rammohan did not contradict the commission's conclusion that claimant's retirement was due solely to nonallowed conditions. Dr. Rammohan did not discuss why claimant retired or whether his industrial

---

1. There has been no allegation from claimant that his retirement was less than total. Work-force departure is further evinced by claimant's PTD application—which was ultimately unsuccessful—which hinges on permanent departure from the labor market.

injury played a part. In fact, what little Dr. Rammohan relates regarding claimant's prior work history is incorrect.[2] Thus, a remand serves no purpose.

The judgment of the court of appeals is hereby reversed, and the commission's order is reinstated.

*Judgment reversed*
*and commission's order reinstated.*

MOYER, C.J., PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

RESNICK and F.E. SWEENEY, JJ., dissent and would affirm the judgment of the court of appeals.

———

*Philip J. Fulton & Associates* and *William A. Thorman III*, for appellee.

*Betty D. Montgomery*, Attorney General, and *William J. McDonald*, Assistant Attorney General, for appellant Industrial Commission.

*Gibson & Robbins–Penniman* and *J. Miles Gibson*, for appellant McDonnell Douglas Corporation.

THE STATE EX REL. KENTON STRUCTURAL & ORNAMENTAL IRON WORKS, INC., APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Kenton Structural & Ornamental Iron Works, Inc. v. Indus. Comm.* (2001), 91 Ohio St.3d 411.]

———

2. Contrary to Rammohan's report, claimant did return to his former position of employment after his industrial injury and worked without incident until his retirement.

(No. 99-1504—Submitted February 27, 2001—Decided May 23, 2001.)

---

*Per Curiam.* In 1995, David A. Hastings, David W. Winters, and Jerry R. Hart worked for appellant, Kenton Structural & Ornamental Iron Works, Inc. ("Kenton"). On March 20, the men were moving large tubing frames from one part of the plant to another, using an overhead crane. One of the frames was composed of six-inch-by-six-inch segments of one-quarter-inch metal tubing. While estimates vary, the frame was approximately ten feet by fifteen feet by thirteen feet. It weighed 9,384 pounds.

Hart and Hastings selected two chains that had successfully moved similar loads just days earlier. The chains were three-eighths of an inch thick and six feet long. A four-inch-wide metal oval ring was attached to each end. The evidence is unclear as to exactly how the chains were rigged to the frame, although the parties appear to agree that they were in a double sling configuration. Thus, the chains were not perpendicular to the load, but were hooked up at an angle. Co-worker Gregory L. Brown later indicated that this was normal procedure. The crane had lifted the frames slightly off the floor when one chain suddenly snapped. Instantly, the other chain snapped and the frame crashed to the ground, toppling onto Hastings. Hastings died at the scene.

An inspection of the site shortly after the accident recovered two broken chain links. One was the same size as links of the chain in question. The other was not.

After a workers' compensation claim was allowed, appellee Stacie R. Hastings, David's widow, applied for additional compensation, charging Kenton with several violations of specific safety requirements ("VSSR"). At a hearing before appellee Industrial Commission of Ohio, testimony focused on two topics: (1) the rated load capacity of the chains, and (2) a possible defect in one of the links. As to the former, steel industry consultant William W. Merrell testified that attached to one of the fatal chains was a manufacturer's tag listing the lifting capacity at six thousand six hundred pounds. The other chain was assumed to be the same. Evidence also demonstrated that rigging chains at an angle reduces the chain's lifting capacity. A chart entitled "Cam–Alloy Chain Sling Working Load Limits" revealed that chains used at a forty-five-degree angle could carry only seventy percent of the maximum working load limit. Merrell testified that this is a universal principle of physics that would apply regardless of the chain's manufacturer.

Merrell also stated that one of the chains, upon testing, was discovered to have a defective master link. He added that this defect could not be detected by mere visual inspection.

Among the findings made by the commission, two are relevant:

"2) 4121:1–5–15(C) requires all hoisting or haulage equipment [to] have a safety factor of no less than five. No violation of this section is found.

"Per the testimony of expert witness Mr. Merrell, chains used for hauling come from the manufacturer with a safety factor of five. Such a safety factor is required of this type of equipment[,] as it is subject to abuse due to the nature of the work involved. Mr. Merrell further indicated [that] there was no reason to assume the chains involved in this accident came with a safety factor of less than five. There has been no evidence presented to indicate [that] the chains in question did not come with a safety factor of five.

"Mr. Merrell testified that after the accident he was able to inspect the chains involved and found that one of the broken links had a defect and thus probably did not meet the safety factor of five at the time of the accident. However, he went on to state [that] there would have been no way to detect this defect, even with close inspection, before the accident. * * * Per *State ex rel. M.T.D. Products [Inc.] v. Stebbins* (1975), 43 [Ohio St.2d] 114 [72 O.O.2d 63, 330 N.E.2d 904], there is no violation for a one time malfunction of safety equipment when such is not foreseeable. Mr. Merrell clearly indicates that there is no way the employer could have become aware of the defect before the accident.

" * * * *

"3) 4121:1–5–15(A) requires equipment such as * * * hoisting or haulage lines * * * chains * * * and attachments used to handle material or equipment shall be used in accordance with the manufacturer's recommendations. A violation of this section is found.

"Section (A) includes the use of chains as hoisting and haulage equipment. Both Winters and Hart state [that] chains were being used, and are what broke, at the time of the accident. * * * [T]he frame in question weighed 9,384 pounds. * * * Mr. Merrell testified [that] the manufacturer's tags, one of which was still attached to one of the chains, showed the manufacturer's ratings for the chains. He stated [that] both of the tags gave a rating of 6,600 pounds for each individual chain. * * * A rating of 6,600 pounds for each chain would amount to a total load limit rating of 13,200 per the previously noted OSHA note taking sheet and the report of BWC Investigator Garver. * * * A sketch in [the] file from Mr. Winters * * * and the previously noted OSHA reports indicate the chains were running at a 45 degree angle. * * * The Cam–Alloy Chain Sling Working Load Limits chart on file indicates that chains used at a 45 degree angle can carry only

70 percent of their maximum manufacturer's recommended load capacity. * * * Mr. Merrell stated this part of the chart would be true of all manufacturers' chains because it is based on physics.

"Based on the facts and evidence stated above it is found [that the two chains involved in the accident were each] being used at a 45 degree angle which reduced [their] capacity by 30 percent. Therefore, 6,600 [minus] 30 percent [equals] 4620. 4620 time[s] 2 [equals] 9,240 total manufacturer's recommended load capacity for the chains as they were used at the time of the accident. Since the load that was being hoisted weighed 9,384 [pounds] it is found [that] the chains were not used in accordance with the manufacturer's recommendations as they were used to hoist a load that exceeded the manufacturer's rated load capacity. This violation was the direct cause of injury[,] as the breaking of the overloaded chains is what led to the hoisted load falling and ultimately hitting the decedent.

"Because of the extent and serious nature of the injuries involved in this case, the number of violations found by OSHA, and the fact [that] OSHA found a number of the violations to be serious, an additional award of compensation is granted to the widow claimant in the amount of 50 percent of the maximum weekly rate * * *."

Reconsideration was denied.

Kenton filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in assessing a VSSR. The court of appeals found the decision to be supported by "some evidence" and denied the writ.

This cause is now before this court on an appeal as of right.

Kenton makes four challenges to the VSSR award: (1) lack of "some evidence," (2) internal inconsistencies, (3) unilateral decedent negligence, and (4) the award's excessiveness. None of these challenges has merit.

1. "Some evidence"

The commission concluded that the chains (1) had a vertical combined lifting capacity of thirteen thousand two hundred pounds and (2) were angled at forty-five degrees. Kenton claims that there is no evidentiary basis for either finding. We find this argument unpersuasive.

Kenton's first assertion is simply wrong. Kenton ignores the Teledyne manu-facturer's tag on one of the chains that specifically rated it at six thousand six hundred pounds. Kenton, moreover, does not dispute that the other unmarked chain was the same type. The tag is, therefore, "some evidence" that each chain was maximally rated at six thousand six hundred pounds when used vertically.

The second issue—rigging angle—is important because of the numbers involved. At exactly forty-five degrees the chains' combined maximum load was reduced to 9,240 pounds. The frame weighed 9,384 pounds. With only a one-hundred-forty-four-pound difference, a variance of a few degrees, according to Kenton, could bring the chains into compliance.

Kenton maintains that because the evidence relied on by the commission estimated the rigging angle at "approximately" forty-five degrees, it is insufficient to establish that the angle was exactly forty-five degrees. Given the strict construction directive in favor of an employer accused of a VSSR, Kenton argues that an abuse of discretion must be found. *State ex rel. Burton v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 545 N.E.2d 1216. We disagree.

The commission is the ultimate arbiter of evidentiary weight and credibility. *State ex rel. Mitchell v. Robbins & Myers, Inc.* (1983), 6 Ohio St.3d 481, 6 OBR 531, 453 N.E.2d 721. In that capacity, it chose not to attach undue weight to the qualifier "approximately." The angle of the chains could not be determined with utter precision after the accident and will never be known. Any assessment—even under the most rigorous scientific scrutiny—will always be an approximation or estimate.

This is not a situation where the commission itself chose a number. OSHA arrived at the forty-five-degree figure. The commission merely decided that the term "approximately" did not undermine the credibility of that assessment. Therefore, we find there was no abuse of discretion.

2. Internal inconsistency

Ohio Adm.Code 4121:1-5-15(A) and (C) address the use of hoisting equipment, including chains. Section (A) demands use according to the manufacturer's specifications, which would include maximum rated load capacity. Ohio Adm. Code 4121:1-5-15(C) requires the chain to have a minimum safety factor of five, meaning that the chain must withstand five times the maximum rated load.

The commission found that the chain had been overloaded and that the excess weight caused it to snap. Hence, a violation of Ohio Adm.Code 4121:1-5-15(A) was found. The commission also found that the chain did not satisfy Section (C). It did not, however, find a violation of Section (C), because the noncompliance was due to an undetectable chain defect. This defect, the commission concluded, invoked *State ex rel. M.T.D. Products, Inc. v. Stebbins* (1975), 43 Ohio St.2d 114, 72 O.O.2d 63, 330 N.E.2d 904, which held that a single unforeseen failure of a safety device could not form the basis of a VSSR.

Kenton criticizes the order as internally inconsistent as to the cause of the accident. It claims that the commission named overloading as the accident's

cause for purposes of Section (A), but then claimed that the link defect caused the failure of the safety factor as to Section (C).

Kenton's real objection addresses the conclusion that an overloaded chain caused the accident, under the theory that moderate overloading would not have mattered if the requisite safety factor existed. Consequently, since the chain's safety factor was reduced by an unforeseeable defect, Kenton would be protected from all VSSRs involving the chain—4121:1–5–15(A) *and* (C).

However, the safety factor is really not an issue unless there is overloading. When the load is within the manufacturer's specifications, the safety factor is not relied on to keep the load suspended. Consequently, the determination that overloading was the proximate cause of an accident is not an abuse of discretion.

Moreover, to reverse the relevant inquiry is to allow Ohio Adm.Code 4121:1–5–15(C) to subsume 4121:1–5–15(A), rendering the latter meaningless. Unless *grossly* overloaded, an overloaded chain that snaps necessarily lacks the requisite safety factor strength as well. If safety factor becomes the primary focus, the same argument will always be made: but for the diminished safety factor, overloading would have been irrelevant. This leaves little incentive for an employer to observe maximum-rated-load recommendations. We cannot endorse such a dangerous disregard for these specifications.

We conclude, therefore, that the commission's analysis was not internally inconsistent. Again, unless severely overloaded, an overloaded chain may prompt two VSSR allegations—excess weight and insufficient safety factor. Here, the commission's review began where it must: with inquiry into the possibility of overloading. In this case, the commission found that the chains were overloaded and that the overloading was the proximate cause of the accident. It then proceeded to the next alleged VSSR—the chain safety factor. There, the commission indeed found failure. Analysis, however, was not complete until the commission determined whether there was any defense to this failure, and it answered that question affirmatively. It concluded that failure was the result of an undetectable defect for which Kenton could not be held responsible.

Thus, it was not inconsistent to find that overloading was the cause of the accident, while the defect was the cause of the safety factor deficiency.

3. Unilateral negligence of the decedent

Kenton maintains that decedent was unilaterally negligent in rigging the chains at a forty-five-degree angle, foreclosing the VSSR award. We do not accept this argument.

Employee negligence bars a VSSR award only where an employee deliberately removes a safety device or otherwise renders a compliant device noncompliant. *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.* (1988), 37 Ohio St.3d

162, 524 N.E.2d 482. It does not apply where the employee simply makes a mistake that results in injury.

In *State ex rel. Cotterman v. St. Marys Foundry* (1989), 46 Ohio St.3d 42, 544 N.E.2d 887, a plant supervisor selected the wrong chains for a job, and, as here, died when the chains failed. His employer argued that because the decedent picked the wrong chains when the right ones were available, no liability attached.

We disagreed. We found that there was no evidence that "the decedent voluntarily chose the incorrect chain. In fact, the commission stated that his decision 'must be considered an aberration attributable to human error.'" *Id.* at 47–48, 544 N.E.2d at 892. Stressing that safety requirements were designed to protect employees from just such errors in judgment, *id.* at 47, 544 N.E.2d at 892, we found that the decedent's act did not bar an award.

Our case is analogous. There is no evidence that decedent knowingly rigged the chains in a way to harm himself or others. To the contrary, co-worker Gregory Brown averred that claimant hooked up the chains in the customary manner. Brown stated that he did not know that angled rigging decreases the load capacity of the chains, and there is no evidence that decedent knew either. Accordingly, decedent's tragic mistake does not bar a VSSR.

4. Award Amount

The amount of a VSSR award can vary from fifteen to fifty percent, inclusive, of the maximum award established by law. Section 35, Article II, Ohio Constitution. The commission levied the maximum penalty "because of the extent and serious nature of the injuries involved in the case, the number of violations found by OSHA, and the fact OSHA found a number of the violations to be serious." Kenton alleges that the commission abused its discretion in relying in part on OSHA violations. We reject this contention.

*State ex rel. St. Marys Foundry Co. v. Indus. Comm.* (1997), 78 Ohio St.3d 521, 678 N.E.2d 1390, recognized the commission's considerable discretion in setting the amount of a VSSR. We wrote:

"[T]he commission's discretion in assessing VSSR amounts is limited only by this constitutional [percentage] standard and * * * the commission commits an abuse of discretion, correctable in mandamus, *only* by assessing an award outside this range." (Emphasis added.) *Id.* at 524, 678 N.E.2d at 1392.

The violation in this case resulted in death, and the award fell within the constitutional parameters. The commission did not abuse its discretion. The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

---

*Kegler, Brown, Hill & Ritter, Timothy T. Tullis* and *David M. McCarty*, for appellant.

*W. Michael Shay*, for appellee Stacie R. Hastings.

*Betty D. Montgomery*, Attorney General, and *Jon D. Grandon*, Assistant Attorney General, for appellee Industrial Commission.

---

THE STATE EX REL. BOND, APPELLANT, *v.* VELOTTA COMPANY ET AL.; INDUSTRIAL COMMISSION OF OHIO, APPELLEE.

[Cite as *State ex rel. Bond v. Velotta Co.* (2001), 91 Ohio St.3d 418.]

(No. 99–1920—Submitted March 13, 2001—Decided May 23, 2001.)

---

*Per Curiam.* The workers' compensation claim of claimant-appellant William J. Bond was initially allowed for "lumbar sprain; contusion left shoulder." Claimant later moved appellee, Industrial Commission of Ohio, to additionally allow his claim for "Grade I–II spondylolisthesis at L5 and S1 by way of direct cause or aggravation of pre-existing condition." He also moved for temporary total disability compensation.

Claimant was examined by, among others, Dr. Arthur L. Hughes, who wrote:

"Spondylolisthesis and spondylolysis are congenital. This means that these conditions may have been present since birth. There is no question that they were aggravated by the patient's extreme obesity. * * *

" 'Aggravation' of these conditions requires that radiculopathy occur as a consequence of the injury. Pain, without radiculopathy, cannot be counted as evidence of aggravation. Mr. Bond did have evidence of radiculopathy at the time he was evaluated by Dr. Perin, though he no longer has clear evidence of radiculopathy. I would, therefore, state there was evidence of aggravation of these pre-existing conditions at the time of Dr. Perin's evaluation, but there is not clear evidence of aggravation at the present time."

A staff hearing officer ultimately allowed the claim for "aggravation of pre-existing grade I spondylolisthesis at L5–S1 *resolved*," based on Dr. Hughes's report. (Emphasis added.) Claimant unsuccessfully contested the inclusion of the word "resolved" administratively.

Claimant appealed to the Court of Common Pleas of Hamilton County. The complaint was dismissed after the judge determined that the issue involved extent of disability and was therefore not appealable. The Court of Appeals for Hamilton County affirmed, and we declined jurisdiction to hear the case. *Bond v. Velotta Co.* (1999), 87 Ohio St.3d 1453, 719 N.E.2d 968.

Claimant then filed a complaint in mandamus in the Court of Appeals for Franklin County. That court denied the writ, finding that the question was not extent of disability, but was one of right to participate—an appealable issue and therefore not subject to mandamus.

This cause is now before this court on an appeal as of right.

Claimant has not contested in his brief the jurisdictional finding made by the Court of Appeals for Franklin County, which is the only issue reached by that court. He instead discusses solely the merits of his case. Claimant's failure to confront the jurisdictional issue is not an impediment to our consideration, however, since subject matter jurisdiction cannot be waived and may be raised by us *sua sponte*. *State ex rel. Wilson–Simmons v. Lake Cty. Sheriff's Dept.* (1998), 82 Ohio St.3d 37, 40, 693 N.E.2d 789, 791; *Springfield Local School Dist. Bd. of Edn. v. Lucas Cty. Budget Comm.* (1994), 71 Ohio St.3d 120, 121, 642 N.E.2d 362, 364. In this instance, we find that it is an issue that must be addressed.

Questions involving the extent of disability are not appealable. R.C. 4123.512(A). Over the years, the question of what constitutes "extent of disability" and, consequently, which workers' compensation issues are and are not appealable has been a contentious one. *Afrates v. Lorain* (1992), 63 Ohio St.3d 22, 584 N.E.2d 1175, simplified that debate by declaring that only those decisions involving a claimant's right to participate or to continue to participate in the workers' compensation system are appealable. *Id.* at paragraph one of the syllabus. The decision of the commission to allow or disallow an additional medical condition is a right-to-participate question and hence appealable. *McClosky v. Regal Mining, Inc.* (1997), 78 Ohio St.3d 171, 677 N.E.2d 335. And this is

appropriate. The question of claimant's extent of disability attributable to spondylolisthesis is irrelevant unless and until that condition becomes part of the claim. The presence, therefore, of an adequate remedy at law renders the current mandamus action untenable.

The judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., concurs in judgment.

---

*O'Connor, Acciani & Levy, Marissa L. Godby* and *Carrie L. Budinger,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Craigg E. Gould,* Assistant Attorney General, for appellee.

---

KEMPPEL ET AL., APPELLANTS, *v.* ZAINO, TAX COMMR., APPELLEE.

[Cite as *Kemppel v. Zaino* (2001), 91 Ohio St.3d 420.]

(No. 00–358—Submitted February 27, 2001—Decided May 23, 2001.)

---

ALICE ROBIE RESNICK, J. In 1989 the assets of the Logan Machine Co. ("Logan"), an Ohio subchapter S corporation located in Akron, were liquidated and the corporation dissolved. The net proceeds from the sale of the assets were distributed to the shareholders, including appellants, Russell and Carrie Kemp-

pel,[1] who were residents of and domiciled in Florida at the time of the sale. As shareholders of Logan, each of the Kemppels received his or her pro rata share of the net proceeds of the sale, including gain from the sale of intangible personal property, which was attributed to goodwill.

To calculate the amount of their nonresident tax credit under R.C. 5745.05(A), the Kemppels calculated the ratio of their non-Ohio income to their total income. In calculating this ratio, the Kemppels included as non-Ohio income all income attributed to them from Logan, except that from ordinary business operations prior to the sale. The Tax Commissioner audited the Kemppels' return and treated all of the income attributed to them from Logan as business income and therefore subject to allocation to Ohio, including the gain from the sale of the intangible personal property (goodwill). As a result, the ratio of the Kemppels' non-Ohio income to total income was reduced, thereby reducing the amount of the Kemppels' nonresident credit and increasing their Ohio tax. The assessment issued by the commissioner included the statutory double interest penalty.

The Kemppels filed for reassessment. After a hearing, the commissioner affirmed his assessment; however, he reduced the statutory interest penalty by one-half. The Kemppels appealed the commissioner's decision to the Board of Tax Appeals, which affirmed the assessment. This cause is now before the court upon an appeal as of right.

The Kemppels present two issues: (1) Is the income attributed to the Kemppels from the gain on the sale of intangible personal property, as a result of the liquidation of Logan, business or nonbusiness income? and (2) Did the Tax Commissioner abuse his discretion in not abating the entire statutory interest penalty?

Because the Kemppels are shareholders in a subchapter S corporation, the character of the income attributed to them from Logan is determined as though they had received it directly from the same source as Logan. *Dupee v. Tracy* (1999), 85 Ohio St.3d 350, 708 N.E.2d 698; Section 1366(b), Title 26, U.S.Code. Thus, if income is business income to Logan, it is business income to the Kemppels; if income is nonbusiness income to Logan, it is nonbusiness income to the Kemppels.

Former R.C. 5747.21 provided: "All items of business income * * * shall be allocated to this state by [apportionment]." Sub.H.B. No. 250, 140 Ohio Laws, Part I, 2643. R.C. 5747.20(B)(2)(c) provides that the nonbusiness income of a nonresident resulting from capital gains from the sale of intangible property is "allocable to this state if the taxpayer's domicile was in this state at the time of

---

1. On February 5, 2001, a suggestion of death was filed for Carrie M. Kemppel. Russell E. Kemppel as administrator of the estate of Carrie M. Kemppel has been substituted as a party.

such sale or other transfer." Since the Kemppels were not domiciled in Ohio at the time of the sale, none of their share of the income from the gain on the sale of the intangible personal property can be allocated to Ohio unless the income is classified as business income.

R.C. 5747.01(B) and (C) define the terms "business income" and "nonbusiness income":

"(B) 'Business income' means income arising from transactions, activities, and sources in the regular course of a trade or business and includes income from tangible and intangible property if the acquisition, rental, management, and disposition of the property constitute integral parts of the regular course of a trade or business operation.

"(C) 'Nonbusiness income' means all income other than business income and may include, but is not limited to, compensation, rents and royalties from real or tangible personal property, capital gains, interest, dividends and distributions, patent or copyright royalties, or lottery winnings, prizes, and awards."

The definition of "business income" set forth in R.C. 5747.01(B) is a modified version of the definition initially promulgated by the National Conference of Commissioners on Uniform State Laws in 1957, as part of its Uniform Division of Income for Tax Purposes Act ("UDITPA"). The UDITPA definition was later adopted by the Multistate Tax Commission. The same definition or a slightly modified version has been adopted by many states.

Courts in other states have split in applying tests for classifying income. Some courts have applied the "transactional test," and others have applied an additional distinct test, the "functional test." To facilitate discussion of these tests we have separated R.C. 5747.01(B) into two parts:

**Part I:** " 'Business income' means income arising from transactions, activities, and sources in the regular course of a trade or business"

and

**Part II:** "includes income from tangible and intangible personal property if the acquisition, rental, management, and disposition of the property constitute integral parts of the regular course of a trade or business operation."

The transactional test, which the Kemppels urge us to adopt, considers the statute as a whole and emphasizes Part I of the definition. It treats Part II as merely giving examples of income within Part I. In this test the income is business or nonbusiness depending on whether it arises from a transaction or activity that occurs in the regular course of the business in which the taxpayer engages. The nature, frequency, and regularity of the transaction are relevant factors. *W. Natural Gas Co. v. McDonald* (1968), 202 Kan. 98, 446 P.2d 781; *Phillips Petroleum Co. v. Iowa Dept. of Revenue & Fin.* (Iowa 1993), 511 N.W.2d

608; *In re Uniroyal Tire Co. v. State Dept. of Revenue* (Ala. 2000), 779 So.2d 227. In addition, some courts also look to see whether the proceeds of the transaction are used in the business or dispersed to shareholders. *Union Carbide Corp. v. Huddleston* (Tenn.1993), 854 S.W.2d 87, 93.

The functional test, which the commissioner urges us to adopt, focuses on Part II, treating it as independent of Part I. Under the functional test, business income includes income from sale of personal property if use of the property constituted an integral part of the regular course of a trade or business operation. The Pennsylvania Supreme Court has stated, "Income meets the functional test if the gain arises from the sale of an asset which produced business income while it was owned by the taxpayer." *Laurel Pipe Line Co. v. Commonwealth, Bd. of Fin. & Revenue* (1994), 537 Pa. 205, 210, 642 A.2d 472, 475. Under the functional test, the extraordinary nature or infrequency of the transaction is irrelevant.

Nevertheless, some courts that have adopted the functional test have also recognized that the sale of assets as part of the total or partial liquidation of a business is different from the sale of assets by a continuing business. In *Polaroid Corp. v. Offerman* (1998), 349 N.C. 290, 306, 507 S.E.2d 284, 296, although the North Carolina Supreme Court recognized the functional test, it noted, in footnote six, "[C]ases involving liquidation are in a category by themselves. Indeed true liquidation cases are inapplicable to these situations because the asset and transaction at issue are not in furtherance of the unitary business, but rather a means of cessation." Likewise, in *Laurel Pipe Line Co.*, the Pennsylvania Supreme Court, while recognizing the functional test, held that the partial liquidation of a company's business by the sale of a pipeline that had been idle for over a year "was not disposed of as an integral part" of the company's regular trade or business and, therefore, was not business income. *Id.,* 537 Pa. at 211, 642 A.2d at 475.

After reviewing these authorities we find that we do not need to determine which test is applicable to decide this case. The income received by Logan was not business income under either the transactional test or the functional test. The income in question resulted from a liquidation of assets followed by a dissolution of the corporation; this was a one-time event that terminated the business. This was no sale in the regular course of a trade or business. Therefore, the income from the gain on the sale of the intangible personal property was not "business income" as defined in R.C. 5747.01(B).

Next the Kemppels contend that the Tax Commissioner abused his discretion by failing to abate the entire statutory penalty. The penalty was based on assessments that the Kemppels no longer dispute, as well as on the assessment that we have determined to be improper. Obviously the portion of the penalty related to the improper assessment must be abated. The Kemppels seek

abatement of the entire penalty because their failure to pay the proper amount of tax was based on the advice of a national accounting firm.

R.C. 5747.15(A)(2) provides that if a taxpayer fails to pay the amount of tax required, "a penalty shall be imposed equal to twice the interest charged under division (G) of section 5747.08 of the Revised Code for the delinquent payment." R.C. 5747.15(C) provides: "All or part of any penalty imposed under this section may be abated by the commissioner if the taxpayer shows that the failure to comply with the provisions of this chapter is due to reasonable cause and not willful neglect." The Tax Commissioner, here, has abated one-half the statutory penalty.

The Kemppels failed to present any evidence to substantiate their claim that the Tax Commissioner abused his discretion as to the assessments that they no longer dispute. In prior cases this court has held that its review of the commissioner's discretionary power to remit a penalty is limited to whether an abuse of discretion has occurred. *Jennings & Churella Constr. Co. v. Lindley* (1984), 10 Ohio St.3d 67, 10 OBR 357, 461 N.E.2d 897. This matter is remanded to the Tax Commissioner to exercise his discretion to reassess the penalty related to the assessments the Kemppels no longer dispute.

*Decision affirmed in part,*
*reversed in part*
*and cause remanded.*

MOYER, C.J., F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

---

*Witschey & Witschey Co., L.P.A., Jeffrey T. Witschey* and *Frank J. Witschey,* for appellants.

*Betty D. Montgomery,* Attorney General, and *Robert C. Maier,* Assistant Attorney General, for appellee.

*Jones, Day, Reavis & Pogue* and *Charles M. Steines,* urging reversal for *amicus curiae* Lewis W. Dickey.

*Taft, Stettinius & Hollister, L.L.P.,* and *Stephen M. Nechemias,* urging reversal for *amici curiae* David S. and Linda K. Paresky.

LITTRELL, ADMR., ET AL., APPELLANTS, *v.* WIGGLESWORTH, ADMR., ET AL.; WESTFIELD INSURANCE COMPANY ET AL., APPELLEES.

STICKNEY, APPELLANT, ET AL., *v.* STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, APPELLEE, ET AL.

KARR, ADMR., ET AL., APPELLANTS, *v.* BORCHARDT; PROGRESSIVE INSURANCE COMPANY, APPELLEES.

[Cite as *Littrell v. Wigglesworth* (2001), 91 Ohio St.3d 425.]

(Nos. 00–745 and 00–801—Submitted January 30, 2001—Decided May 23, 2001.)

(No. 98–2445—Submitted January 30, 2001—Decided May 23, 2001.)

(Nos. 99–219, 99–223 and 99–224—Submitted January 30, 2001—Decided May 23, 2001.)

Nos. 13–98–33, 13–98–35 and 13–98–34.

DOUGLAS, J.

*Littrell v. Wigglesworth*

On February 16, 1997, John Littrell, Jr., was the driver of a motor vehicle that was owned by his mother-in-law, Stella Pratt,[1] when he was involved in a head-on collision with a motor vehicle operated by Jeffrey Wigglesworth. The collision was caused when Jeffrey's automobile allegedly veered left of center and collided with the Pratt vehicle. As a result of the accident, John and Jeffrey were both killed. Stella Pratt, a passenger with John, was also killed. Other occupants of the Pratt vehicle, John's wife, Ina Littrell, and John's children, Dennis and Suzanne, also suffered injuries.

At the time of the accident, Jeffrey was insured under a policy of automobile liability insurance with State Farm Mutual Automobile Insurance Company ("State Farm") with liability limits of $100,000 per person and $300,000 per accident and a $1 million liability umbrella policy. The Pratt vehicle was insured under a policy of automobile liability insurance with Colonial Penn Insurance Company ("Colonial Penn") that provided uninsured/underinsured motorist coverage with limits of $100,000 per person and $300,000 per accident. Ina Littrell was insured under a policy of automobile liability insurance issued by Westfield Insurance Company ("Westfield") that included uninsured/underinsured motorist coverage in the amount of $500,000 per accident. All five occupants of the Pratt vehicle were insureds under the Westfield policy as family members residing in the same household and the Colonial Penn policy as the insurer of the Pratt minivan.[2]

On February 9, 1998, appellants, Ina Littrell, individually and as administrator of the estate of John Littrell, Jr., Linda Littrell, as guardian of Dennis and Suzanne Littrell, and Naomi Gadberry, as administrator of the estate of Stella Pratt, filed personal injury and wrongful death claims, in the Court of Common Pleas of Butler County, against Nancy Wigglesworth, as administrator of the estate of Jeffrey Wigglesworth. Appellants also sought underinsured motorist benefits under the Colonial Penn and Westfield policies. The complaint further sought underinsured motorist proceeds for James Littrell, John, Jr.'s brother, who had underinsured motorist coverage with Preferred Risk Mutual Insurance Company, and for Ernie Pratt, Jr., Stella Pratt's grandson, who had underinsured motorist coverage with Allstate Insurance Company. The trial court granted summary judgment in favor of the defendant insurance companies.

On appeal, the Court of Appeals for Butler County affirmed the judgment of the trial court. The court of appeals subsequently found its decision to be in

---

1. Cheryl Pratt, Stella's daughter, was a co-owner of the vehicle.

2. In its opinion, the court of appeals also confirms that all occupants in the Pratt vehicle are covered insureds for purposes of the Westfield and Colonial Penn policies.

conflict with two decisions of the Second District Court of Appeals, *Estate of Fox v. Auto–Owners Ins. Co.* (June 12, 1998), Montgomery App. No. 1456, unreported, 1998 WL 309212, and *Berry v. Przyborowski* (Nov. 19, 1999), Miami App. No. 99–CA–21, unreported, 1999 WL 1043880.

This cause is now before this court upon our determination that a conflict exists (case No. 00–801), and pursuant to the allowance of a discretionary appeal (case No. 00–745).

### *Stickney v. State Farm Mut. Auto. Ins. Co.*

On January 20, 1996, Jennifer R. Stickney was a passenger in an automobile driven by Eric Semon. Jennifer was killed as a result of injuries she sustained when Semon lost control of the vehicle. On December 2, 1996, appellant, Scott A. Stickney, Jennifer's father and the administrator of her estate, settled with the tortfeasor's insurer for $125,000.

At the time of the accident, Scott, his wife, Cynthia Stickney, another daughter, Gina Stickney, and son, Scott Stickney, Jr., were insureds under two policies of automobile liability insurance with appellee State Farm. Each policy provided uninsured/underinsured motorist coverage with limits of $100,000 per person and $300,000 per occurrence. On April 25, 1997, appellant, along with surviving family members, brought a declaratory judgment action against appellee seeking uninsured/underinsured motorist benefits under the State Farm policies. Both sides submitted motions for summary judgment. On January 20, 1998, the trial court granted summary judgment in favor of State Farm. An appeal was filed, and on October 19, 1998, the Richland County Court of Appeals affirmed the judgment of the trial court.

On November 16, 1998, appellant filed a notice of appeal with this court. On May 24, 2000, we vacated the judgment of the court of appeals and remanded this matter to the trial court for further proceedings. *Stickney v. State Farm Mut. Auto. Ins. Co.* (2000), 88 Ohio St.3d 504, 727 N.E.2d 1286. On August 2, 2000, we granted a motion for reconsideration solely to address the issue presented in appellant's second proposition of law and held this matter for a decision in case Nos. 00–745 and 00–801, *Littrell v. Wigglesworth.* *Stickney v. State Farm Mut. Auto. Ins. Co.* (2000), 89 Ohio St.3d 1471, 732 N.E.2d 1001.

### *Karr v. Borchardt*

On July 8, 1996, Helen Beddow was a passenger in an automobile driven by her husband, Andrew. Helen was injured when Andrew's vehicle and a vehicle driven by Elizabeth Borchardt collided. Helen subsequently died as a result of her injuries.

Helen was survived by Andrew and four adult children, Ginger Karr, Vicki Husk, John Beddow, and Sharon Sumpter. On January 3, 1997, wrongful death and survival claims were filed in the Court of Common Pleas of Seneca County against Borchardt on behalf of appellants, Ginger Karr, Vicki Husk, and John Beddow.[3] The complaint also sought a declaration that appellants were entitled to recover underinsured motorist benefits from their respective automobile liability insurance policies.

At the time of the accident, Borchardt was insured under a policy of automobile liability insurance with Westfield Insurance Company, with policy limits of $100,000 per person and $300,000 per occurrence. Ginger Karr was insured through a policy of automobile liability insurance issued by Progressive Insurance Company, which provided underinsured motorist coverage benefits of $12,500 per person and $25,000 per accident. Vicki Husk had a policy of automobile liability insurance issued by Allstate Insurance Company, which provided underinsured motorist coverage of $100,000 per person and $300,000 per accident. John Beddow had an automobile liability insurance policy issued by State Farm that included underinsured motorist coverage with limits of $50,000 per person and $100,000 per accident. Appellants' claims against Borchardt were settled for the limits of Borchardt's policy, and Westfield paid $100,000 to the estate of Helen Beddow.[4] The trial court subsequently granted motions for summary judgment in favor of appellees, Allstate Insurance, Progressive Insurance, and State Farm Insurance. The Court of Appeals for Seneca County affirmed the judgments of the trial court.

On January 29, 1999, appellants, Ginger Karr (case No. 99–219), Vicki Husk (case No. 99–223), and John Beddow (case No. 99–224) filed notices of appeal with this court. On May 24, 2000, we vacated the judgment of the court of appeals and remanded this matter to the trial court for further proceedings. *Karr v. Borchardt* (2000), 88 Ohio St.3d 535, 728 N.E.2d 362. On August 2, 2000, we granted a motion for reconsideration solely to address the issue presented in appellants' third proposition of law and held this matter for a decision in case Nos. 00–745 and 00–801, *Littrell v. Wigglesworth. Karr v. Borchardt* (2000), 89 Ohio St.3d 1471, 732 N.E.2d 1002.

I. Statutory Setoff Against Underinsured Motorist Coverage

On October 20, 1994, the General Assembly enacted Am.Sub.S.B. No. 20 ("S.B. 20"), which amended R.C. 3937.18, that section of the Revised Code requiring the

---

3. The remaining surviving beneficiaries, Andrew Beddow and Sharon Sumpter, are not parties to the *Karr* appeals.

4. The limit of liability of Borchardt's policy with Westfield Insurance Company was $100,000 per person and $300,000 per occurrence. While there is no verification in the record before us, the parties do not dispute that $200,000 was paid to the other injured passengers in the Beddow vehicle.

mandatory offering of uninsured and underinsured motorist coverage. These appeals involve the S.B. 20 amendments to R.C. 3937.18(A)(2), which requires liability insurance policies to provide the following[5]:

"Underinsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage and shall provide protection for an insured against loss for bodily injury, sickness, or disease, including death, suffered by any person insured under the policy, where the limits of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured are less than the limits for the insured's uninsured motorist coverage. Underinsured motorist coverage is not and shall not be excess insurance to other applicable liability coverages, and shall be provided only to afford the insured an amount of protection not greater than that which would be available under the insured's uninsured motorist coverage if the person or persons liable were uninsured at the time of the accident. The policy limits of the underinsured motorist coverage shall be reduced by those *amounts available for payment* under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." (Emphasis added.)

In *Stickney*, the question is whether, in a claim for underinsured motorist benefits, the term "amounts available for payment" in R.C. 3937.18(A)(2) should be construed to mean those amounts *actually received* by the insured from the tortfeasor's automobile liability insurance coverage. In *Karr*, essentially the same issue is framed as whether the limits of a claimant's underinsured motorist coverage are compared to the limits of the tortfeasor's automobile liability coverage or whether they are compared to the amounts actually received by a claimant from the tortfeasor's liability policy. Finally, in *Littrell*, the Butler County Court of Appeals certified the following question for our consideration: "Whether R.C. 3937.18[(A)(2)] precludes recovery merely because the insured's underinsured motorist coverage limits are identical to or less than the tortfeasor's liability limits when, due to the presence of multiple claimants, the insured is unable to recover the tortfeasor's limits."

The setoff provision of R.C. 3937.18(A)(2) was amended by S.B. 20 by the addition of this sentence: "The policy limits of the underinsured motorist coverage shall be reduced by those amounts available for payment under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured."

---

5. There have been two subsequent amendments to R.C. 3937.18(A)(2) since the enactment of S.B. 20. See 147 Ohio Laws, Part II, 2373; 2000 Sub.S.B. No. 267, effective September 21, 2000. However, those changes were minor, and the language of R.C. 3937.18(A)(2) under consideration here has remained unchanged.

We recognize that *Stickney* has not been briefed. However, the issue before the court has been fully briefed in *Karr* and *Littrell*. In addition, the *Littrell* case was presented in oral argument. Further, this same issue has been fully briefed and argued in *Clark*.

In accordance with our holding in *Clark v. Scarpelli* (2001), 91 Ohio St.3d 271, 744 N.E.2d 719, "[f]or the purpose of setoff, the 'amounts available for payment' language in R.C. 3937.18(A)(2) means the amounts actually accessible to and recoverable by an underinsured motorist claimant from all bodily injury liability bonds and insurance policies (including from the tortfeasor's liability carrier)." *Id.* at syllabus.

In *Clark,* we stated that the original purpose of underinsured motorist coverage was to ensure that persons injured by an underinsured motorist would receive at least the same amount of total compensation as they would have received had they been injured by an uninsured motorist. *Id.* at 275, 744 N.E.2d 719, citing *James v. Michigan Mut. Ins. Co.* (1985), 18 Ohio St.3d 386, 389, 18 OBR 440, 443, 481 N.E.2d 272, 274–275, disapproved on other grounds in *Cole v. Holland* (1996), 76 Ohio St.3d 220, 667 N.E.2d 353. We noted that " 'it would make no sense for this court to reach the absurd result that an injured party is better off when struck by an uninsured tortfeasor than by a person who possesses liability insurance.' " *Clark,* 91 Ohio St.3d at 275, 744 N.E.2d at 725, quoting *Cincinnati Ins. Co. v. Phillips* (1990), 52 Ohio St.3d 162, 165, 556 N.E.2d 1150, 1153. We further emphasized that pursuant to R.C. 3937.18(A)(2), as amended by S.B. 20, underinsured motorist coverage was not intended to be excess insurance to the tortfeasor's liability coverage and that the statutory language indicated that a person injured by an underinsured motorist should never be afforded greater coverage than that which would be available had the tortfeasor been uninsured. *Clark,* 91 Ohio St.3d at 276, 744 N.E.2d at 725.

In light of the reasoning concerning R.C. 3937.18(A)(2) set forth in *Clark,* the matters before us can now be fully and properly resolved. We now proceed to apply the law pronounced therein to each of these appeals.

## II. *Littrell v. Wigglesworth*

Appellants contend that to determine the setoff against the underinsured motorist coverage in a situation involving multiple claimants,[6] R.C. 3937.18(A)(2) requires a comparison of the amounts available for payment to each insured from the tortfeasor. Appellants argue that the statutory language does not permit

---

6. In our continuing review, case by case, of the issues surrounding the application and accessibility of uninsured and underinsured motorist coverage, it would appear that, in most cases, the application of the R.C. 3937.18(A)(2) "amounts available for payment" language arises when *both* multiple parties *and* multiple policies are involved.

underinsured motorist carriers to set off the total amounts paid to all other injured claimants but merely allows a setoff of the amounts each insured has received from the tortfeasor.

The tortfeasor, Jeffrey Wigglesworth, had $1,300,000 in available liability coverage through State Farm, all of which was tendered and accepted in settlement of all claims against Wigglesworth's estate and State Farm. According to appellants, the entire $1,300,000 was allocated to the five occupants of the Pratt vehicle. The estate of John Littrell, Jr., received $415,000, the estate of Stella Pratt received $275,000, Ina Littrell received $460,000 on her personal injury claim, and Dennis and Suzanne Littrell each received $75,000 for their personal injury claims.

Colonial Penn, which provided automobile liability insurance for the Pratt minivan, has been dismissed from this appeal pursuant to a settlement agreement of the affected parties. Preferred Risk, the automobile liability insurer for James Littrell, John, Jr.'s brother, has also been dismissed by agreement. Therefore, the only policies remaining under consideration are Ina Littrell's Westfield policy and Ernie Pratt, Jr.'s Allstate policy.

## A. Westfield Policy

The Westfield policy insured all five occupants of the Pratt minivan and provided underinsured motorist coverage with a single policy limit of $500,000 per accident. Had the tortfeasor been an uninsured motorist, the maximum amount available to the five occupants of the Pratt minivan would have been $500,000. The amount available for payment from the tortfeasor was $1,300,000, which was paid to the claimants herein. As this amount exceeds the amount available from the Westfield policy, the occupants of the Pratt minivan are not entitled to underinsured motorist benefits from Westfield.[7]

## B. Allstate Policy

Ernie Pratt, on the other hand, is entitled to underinsured motorist benefits. Ernie Pratt, the grandson of decedent Stella Pratt, filed a claim for underinsured motorist benefits through his automobile liability policy with Allstate. The Allstate policy provided underinsured motorist coverage with limits of $25,000 per person and $50,000 per accident.

Stella Pratt was struck and killed by a tortfeasor possessing $1,300,000 in liability coverage. Allstate argues for a strict limits-to-limits approach, wherein the limits of the tortfeasor's liability policy are compared to the limits of the

---

7. This case illustrates well the *multiple*-policies issue. If each of the five occupants of the Pratt minivan had had a separate policy of insurance, then each would have had coverage under his or her own policy up to the single policy limit less any sums received from the tortfeasor's policy.

underinsured motorist claimant's automobile policy, which would preclude Ernie from any recovery of underinsured motorist benefits because the tortfeasor's liability limits far exceeded the stated limits of Ernie's policy with Allstate. Allstate argues that a limits-to-limits comparison satisfies both the language of and public policy behind R.C. 3937.18(A)(2).

While we rejected this contention in *Clark*, the fallacy of Allstate's position is further illustrated by Ernie Pratt's underinsured motorist claim. According to the parties, Ernie received, from the $275,000 paid to the estate of Stella Pratt, $8,000 in wrongful death proceeds, presumably as a next of kin. See R.C. 2125.02(A)(1). Had Stella Pratt's death resulted from an accident with an uninsured motorist, Ernie would have had uninsured motorist coverage from his Allstate policy up to the $25,000 per-person limit. Under a comparison of the limits, Ernie would not be entitled to recover underinsured motorist benefits. Thus, a strict policy-limits-to-limits comparison is untenable, as clearly it would give Ernie more coverage had Stella been killed in an accident caused by an uninsured motorist.

Furthermore, while it is true that the tortfeasor's automobile liability proceeds far exceeded the limits of Ernie's Allstate policy, the entire amount of the tortfeasor's policy has been allocated for the wrongful death and personal injuries suffered by the five occupants of the Pratt minivan. Allstate would have us apply the entire $1,300,000 settlement from the tortfeasor as a setoff against the limits of Ernie's automobile liability policy when, in fact, those proceeds have been exhausted by payments to parties other than Allstate's own insured, Ernie. For the policy reasons set forth by the General Assembly and explained both in *Clark* and herein, we reject this argument of Allstate.

Moreover, it is only because Ernie has a separate automobile liability policy through Allstate that he is able to recover underinsured motorist benefits. Ernie was not an insured under either the Westfield or Colonial Penn policies that provided underinsured motorist coverage for the occupants of the Pratt minivan. As a result, if Ernie did not have a separate contract of automobile liability insurance with Allstate, he would have no claim at all for underinsured motorist coverage regardless of the settlement received from the tortfeasor or the policy limits provided in the Westfield or Colonial Penn policies.

Therefore, because Ernie did receive $8,000 out of the proceeds paid by the tortfeasor for the wrongful death of Stella Pratt, that is the amount available for payment from the tortfeasor. Ernie is, therefore, entitled to underinsured motorist coverage up to the single, per-person limit of his Allstate policy, reduced by the amount received from the tortfeasor.

### III. *Stickney v. State Farm Mut. Auto. Ins. Co.*

Appellant, Scott Stickney, received $125,000 from the tortfeasor's liability carrier toward his damages resulting from the death of his daughter, Jennifer. Scott's wife, Cynthia, and their other children, Gina and Scott, Jr., did not receive any share of the settlement proceeds. Two automobile liability insurance policies, insuring Scott and his family and issued by State Farm with underinsured motorist coverage limits of $100,000 per person and $300,000 per accident, were in effect at the time of Jennifer's accidental death. According to appellant, since Cynthia, Gina, and Scott, Jr., as statutory wrongful death beneficiaries, did not share in the settlement proceeds received from the tortfeasor's liability carrier, they are entitled to recover underinsured motorist benefits from the State Farm policies. State Farm, on the other hand, contends that the $125,000 from the tortfeasor's liability policy was the amount available for payment applicable to all wrongful death claimants and that is the amount that should be set off against the $100,000 per-person limits of the State Farm policies.

In order to determine the amount of underinsured motorist coverage available to the wrongful death beneficiaries, we begin by determining the amount that those beneficiaries would have received had their losses resulted from the negligence of an *un*insured motorist. There apparently is no dispute between the parties concerning the antistacking clause and the single per-person limit provision in the State Farm policies. The trial court granted summary judgment in favor of State Farm, and appellant did not challenge the validity of these clauses on appeal. Thus, had appellant's decedent been killed by an uninsured motorist, the maximum amount that all wrongful death beneficiaries could have recovered in uninsured motorist benefits, according to policy language permitted by R.C. 3937.18(H), would have been the $100,000 per-person limit of the State Farm policy. Pursuant to R.C. 3937.18(A)(2), underinsured motorist coverage is "provided only to afford the insured an amount of protection not greater than that which would be available under the insured's uninsured motorist coverage" had the tortfeasor been uninsured at the time of the accident. The amount awarded to decedent's personal representative for the benefit of the next of kin, $125,000, is the amount available for payment. Since this amount exceeds that which would be available under appellant's uninsured motorist coverage, the wrongful death beneficiaries are not entitled to underinsured motorist benefits from State Farm.

### IV. *Karr v. Borchardt*

The parties agree that $100,000 was paid from the tortfeasor's liability carrier to the personal representative of decedent Helen Beddow and distributed equally among the five statutory wrongful death beneficiaries, each receiving $20,000.

The appellants argue that although $100,000 in liability proceeds had been paid to the survivors of the deceased, Helen Beddow, $100,000 was not available for payment *to each insured* but, rather, that amount was available for payment *to all statutory beneficiaries*. Appellants contend that each statutory wrongful death beneficiary received slightly less than $9,000 from the tortfeasor (his or her pro rata share after expenses, attorney fees, and a statutory subrogation lien to Medicare) and that is the "amount available for payment" that should be compared to the policy limits of the underinsured motorist coverage. In contrast, the insurers contend that each statutory beneficiary's share of the liability coverage received from the tortfeasor ($20,000), and not his or her net recovery, is the figure that must be compared to the limits of underinsured motorist coverage for purposes of calculating setoff and determining whether the tortfeasor was underinsured within the meaning of R.C. 3937.18(A)(2). Appellees urge that $20,000 is the amount available for payment and that attorney fees and other expenses should not be taken into consideration. Appellees are correct, with the exception that the pro rata share of the statutory subrogation lien to Medicare should not be charged as part of the setoff. Our explanation of the appropriate calculations for each claimant follows.

As a preliminary matter, we hold that expenses and attorney fees are not part of the setoff equation. Such fees are an expense of an insured and should not act, in order to increase underinsured motorist benefits, to reduce the "amounts available for payment" from the tortfeasor's automobile liability carrier. Conversely, a statutory subrogation lien to Medicare should be considered when determining the amounts available for payment from the tortfeasor. Such a lien is not an expense of an insured.

Appellants claim that the total amount of the statutory subrogation lien to Medicare is $21,698.13. Thus, the charge to each of the five wrongful death beneficiaries for their pro rata share of the Medicare lien is $4,339.63.

### A. Ginger Karr

Based on the foregoing, it is apparent that Ginger Karr is not entitled to underinsured motorist benefits. At the time of her mother's fatal accident, Ginger had in effect an automobile liability policy with Progressive that provided underinsured motorist coverage in the amount of $12,500 per person and $25,000 per accident. If the decedent had been killed by an uninsured motorist, Ginger would have had uninsured motorist coverage up to a maximum amount of $12,500. Ginger has received $20,000 from the tortfeasor. After taking into consideration Ginger's pro rata share of the subrogation lien, and subtracting that amount ($4,339.63) from the $20,000 that Ginger recovered from the tortfeasor, Ginger's actual amount recovered was $15,660.37. If the accident had been caused by the negligence of an uninsured motorist, Ginger could not have received more than

the $12,500 per-person limit from her Progressive policy. Therefore, Ginger is not entitled to underinsured motorist coverage.

## B. Vicki Husk and John Beddow

However, Vicki Husk and John Beddow are entitled to underinsured motorist coverage from their respective policies. Vicki Husk had underinsured motorist coverage with Allstate Insurance Company with limits of $100,000 per person and $300,000 per accident. Vicki could, therefore, collect up to the $100,000 per-person limit if the accident had been the fault of an uninsured motorist. In comparison, the amount available for payment to Vicki from the tortfeasor's liability carrier was the same as it was to her sister, Ginger Karr, approximately $15,660. As a result, the tortfeasor was underinsured as to Vicki, and Vicki has underinsured motorist coverage up to the per-person limit of her Allstate policy after setting off the amount recovered from the tortfeasor.

John Beddow had an automobile liability insurance policy issued by State Farm that provided underinsured motorist coverage with limits of $50,000 per person and $100,000 per accident. John's recovery from the tortfeasor was approximately $15,660, the amount available for payment to all statutory wrongful death beneficiaries. As John could have collected up to his per-person limit of $50,000 had the tortfeasor been an uninsured motorist, John also is entitled to underinsured motorist coverage. Accordingly, John may collect underinsured motorist benefits up to the per-person limit of his State Farm policy less the amount available for payment from the tortfeasor.

## V. Conclusion

We therefore reverse the judgments of the courts of appeals and remand these matters to the trial courts for further proceedings consistent with this opinion, recognizing, of course, that action taken by the trial courts in *Stickney* and *Karr* based on our previous remand may have been dispositive of these matters.

*Judgments reversed*
*and causes remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

---

COOK, J., dissenting. Recently, I respectfully dissented from this court's decision interpreting the phrase "amounts available for payment" in R.C. 3937.18(A)(2). See *Clark v. Scarpelli* (2001), 91 Ohio St.3d 271, 284, 744 N.E.2d 719, 731 (Cook, J., concurring in part and dissenting in part). I predicated my

dissent upon the *Clark* majority's having reached and decided an issue that *Clark* did not, and could not, even present. I further noted my view that the *Clark* majority had misconstrued the validity of *Motorists Mut. Ins. Co. v. Andrews* (1992), 65 Ohio St.3d 362, 604 N.E.2d 142, misappropriated authority reserved to the General Assembly, and misapplied R.C. 3937.18(A)(2)'s triggering provision. The majority today repeats these same errors.

## I. Triggering

By reaching the setoff issue in the consolidated cases, the majority here, as in *Clark,* incorrectly accepts that underinsured motorist coverage has first been triggered. As I explained in my dissent in *Clark,* the General Assembly has superseded the interpretation of the triggering provision to which the majority erroneously adheres.[8] See Section 7, Am.Sub.S.B. No. 20, 145 Ohio Laws, Part I, 238; *Clark v. Scarpelli* (2001), 91 Ohio St.3d at 287–288, 744 N.E.2d at 733–734 (Cook, J., concurring in part and dissenting in part). The plain language of the statute mandates a limits-to-limits comparison as opposed to a comparison of the amounts actually recovered to the underinsured motorist policy limits. This limits-to-limits comparison precludes application of underinsured motorist coverage in *Littrell, Stickney,* and *Karr.*

### *Littrell*

In regard to *Littrell,* the majority correctly concludes, albeit using wrong reasoning, that there can be no recovery from the underinsured motorist coverage of Ina Littrell's policy. The majority erroneously concludes, however, that Ernie Platt may recover under his policy. But as the majority acknowledges, when comparing limits to limits, Platt cannot recover "because the tortfeasor's

---

8. Section 7, S.B. 20, 145 Ohio Laws, Part I, 238, provides:

"It is the intent of the General Assembly in amending division (A)(2) of section 3937.18 of the Revised Code to supersede the effect of the holding of the Ohio Supreme Court in the October 1, 1993 decision in *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500 [620 N.E.2d 809], relative to the application of underinsured motorist coverage in those situations involving accidents where the tortfeasor's bodily injury liability limits are greater than or equal to the limits of the underinsured motorist coverage."

I have previously explained the effect of this uncodified law as follows:

"Given such an explicit expression of legislative intent, I cannot agree that the General Assembly intended to adhere to the *Andrews–Savoie* construction of the triggering provision of R.C. 3937.18(A)(2). Because *Savoie* and *Andrews* contain the same erroneous interpretation of the statute, superseding *Savoie* has the practical effect of superseding *Andrews.* The 'triggering' sentence of R.C. 3937.18(A)(2) should therefore not be interpreted pursuant to the *Andrews–Savoie* 'amount recovered to limits of UIM coverage' comparison. Rather, the uncodified law should be viewed as evincing an intent to correct this court's prior, erroneous interpretation of the triggering provision set forth in *Andrews* and *Savoie* and to reinforce the limits-to-limits comparison that the plain language of the statute warrants." *Clark,* 91 Ohio St.3d at 287–288, 744 N.E.2d at 734 (Cook, J., concurring in part and dissenting in part).

liability limits far exceeded the stated limits of Ernie's policy with Allstate." That is the correct result under the law enacted by the General Assembly. While the majority rejects this interpretation on the basis that "a strict policy-limits-to-limits comparison is untenable," "the role of a court is not to decide what the law *should* say; rather, the role of this court is to interpret what the law says *as it has been written by the General Assembly*—regardless of whether it constitutes sound policy." (Emphasis *sic.*) *Clark*, 91 Ohio St.3d at 291, 744 N.E.2d at 736 (Cook, J., concurring in part and dissenting in part), citing *Cablevision of the Midwest, Inc. v. Gross* (1994), 70 Ohio St.3d 541, 544, 639 N.E.2d 1154, 1156.

## *Stickney*

The majority correctly determines that there is no underinsured recovery in *Stickney*, but again uses the same wrong reasoning. It is not that the amount actually recovered by Scott Stickney offsets any applicable underinsured motorist coverage that resolves the question; rather, the fact that the limits of coverage available under the tortfeasor's policy equaled the limits of the underinsured motorist coverage precluded further recovery. Like Platt's underinsured motorist coverage in *Littrell*, Stickney's coverage was never even triggered.

## *Karr*

The majority is similarly correct in finding no underinsured recovery but wrong in rationale in regard to Ginger Karr in *Karr*. Although Karr's recovery exceeded her $12,500 per-person policy limit, it is the triggering provision and not the setoff provision of R.C. 3937.18(A)(2) that forecloses recovery. Further, because a limits-to-limits comparison of Borchardt's $100,000/$300,000 liability policy and the respective policies held by Vicki Husk ($100,000/$300,000) and John Beddow ($50,000/$100,000) reveals either equal limits, or in Beddow's case, a higher policy limit, underinsured motorist coverage is not triggered. The majority should not, therefore, have reached the issues of how expenses, attorney fees, and Medicare payments figure in calculating setoff under R.C. 3937.18(A)(2).

## II. Setoff

In my dissent in *Clark*, I noted that to regard the phrase "amounts actually recovered" in pre-S.B. 20 R.C. 3937.18(A)(2) as having the same meaning as the phrase "amounts available for payment" in the amended statute "espouses the view that the 1994 amendment to the statute was merely cosmetic, then, as it would have effected no substantive change." *Clark*, 91 Ohio St.3d at 291, 744 N.E.2d at 736–737 (Cook, J., concurring in part and dissenting in part). Because this issue of interpretation was not properly presented in *Clark*, I expressed no opinion as to its ultimate validity. But because the majority has continued to adhere to its erroneous reasoning, I address the issue here so as to clarify just

what I assess to be the proper rationale to be applied in those cases in which the issue of setoff actually exists.

Even if these cases *did* present the issue of what amounts the R.C. 3937.18(A)(2) setoff provision contemplates—and even though I agree with the conclusion that the majority reaches—I would not join in the majority's reasoning. This is so because the majority's questionable reliance on *Andrews* is wholly unnecessary. Rather, uncodified law expresses legislative intent to provide for setoff of the amounts actually recovered.

A review of the legislative development of underinsured motorist law reveals that the General Assembly enacted former R.C. 3937.181 in 1980 with the passage of Am.Sub.H.B. No. 22. That statute contained no explicit setoff provision, but incorporated the subrogation provision for uninsured motorist coverage contained in R.C. 3937.18(C). 138 Ohio Laws, Part I, 1458, 1460. That latter section provided that "the insurer * * * is entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of [the injured party] against [the tortfeasor]." *Id.* at 1459.

In 1982, the General Assembly. passed Am.Sub.H.B. No. 489. This bill repealed R.C. 3937.181 and incorporated reworked underinsured motorist coverage provisions into R.C. 3937.18. The resulting version of R.C. 3937.18(A)(2) provided that the limits of an insured's recovery were to be calculated as follows:

"The limits of liability for an insurer providing underinsured motorist coverage shall be the limits of such coverage, less those amounts actually recovered under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." 139 Ohio Laws, Part II, 2937.

The setoff scheme therefore called for subtracting the *amount paid* to the injured party from the limits of that party's underinsured motorist policy.

The General Assembly then passed Am.Sub.S.B. No. 20 ("S.B. 20") in 1994. S.B. 20 amended the setoff provision of R.C. 3937.18(A)(2) to read[9]:

"The policy limits of the underinsured motorist coverage shall be reduced by those amounts available for payment under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." 145 Ohio Laws, Part I, 211.

I find that the uncodified law found in Section 8 of S.B. 20, 145 Ohio Laws, Part I, 204, 238, answers just what the phrase "amounts available for payment" is intended to mean. That section provides:

---

9. The General Assembly also amended R.C. 3937.18 in 1997 (147 Ohio Laws, Part II, 2372), 1999 (S.B. No. 57), and 2000 (Sub.S.B. No. 267). These amendments did not alter the setoff provision of R.C. 3937.18(A)(2).

"It is the intent of the General Assembly in amending division (A)(2) of Section 3937.18 of the Revised Code to declare and confirm that the purpose and intent of the 114th General Assembly in enacting division (A)(2) of section 3937.18 in Am. H.B. 489 was, and the intent of the General Assembly in amending section 3937.18 of the Revised Code in this act is, to provide an offset against the limits of the underinsured motorist coverage of those amounts available for payment from the tortfeasor's bodily injury liability coverage." *Id.* at 238.

With this the General Assembly stated that it intended the phrase "amounts available for payment" in the amended statute to have the same effect and purpose as the phrase "amounts actually recovered" in the prior version of the statute. This expression of intent resolves the interpretation issue without resort to the majority's contorted deductions from the *Andrews* case.[10]

## III. Conclusion

For the foregoing reasons, I disagree with the majority's deciding an issue of underinsured motorist law not presented by the cases at bar. Were the setoff question actually presented, the relevant uncodified law would lead me to concur only in the syllabus language, with the exception of its reliance on the erroneous *Clark.* Because I would affirm the courts of appeals, I respectfully dissent.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

---

*Elk & Elk Co., L.P.A., Thomas L. Dettelbach* and *Todd O. Rosenberg,* for appellants in case No. 98–2445.

*Meyers, Hentemann & Rea Co., L.P.A., Henry A. Hentemann* and *J. Michael Creagan,* for appellee in case No. 98–2445.

*Murray & Murray Co., L.P.A., Dennis E. Murray, Sr., W. Patrick Murray, Charles M. Murray* and *Steven C. Bechtel,* for appellants in case Nos. 99–219, 99–223 and 99–224.

*Meyers, Hentemann & Rea Co., L.P.A., Henry A. Hentemann* and *J. Michael Creagan,* for appellee Progressive Insurance Company in case No. 99–219.

---

440

*Eastman & Smith, Ltd.,* and *John D. Willey, Jr.,* for appellee Allstate Insurance Company in case No. 99–223.

*Gallagher, Bradigan, Gams, Pryor & Littrell, L.L.P.,* and *James R. Gallagher; Kitch, Drutchas, Wagner & Kenney, P.C., John S. Wasung* and *Susan Healy Zitterman,* for appellee State Farm Mutual Automobile Insurance Company in case No. 99–224.

*Waite, Schneider, Bayless & Chesley* and *Arthur D. Rabourn; Casper & Casper* and *Margaret H. McCollum,* for appellants in case Nos. 00–745 and 00–801.

*Benjamin, Yocum & Heather, L.L.C., Timothy P. Heather* and *Charles F. Hollis III,* for appellee Allstate Insurance Company in case Nos. 00–745 and 00–801.

*Droder & Miller Co., L.P.A.,* and *W. John Sellins,* for appellee Westfield Insurance Company in case Nos. 00–745 and 00–801.

*Murray & Murray Co., L.P.A., Steven C. Bechtel, W. Patrick Murray* and *Charles M. Murray,* urging reversal for *amicus curiae* Ohio Academy of Trial Lawyers in case Nos. 00–745 and 00–801.

*Elk & Elk Co., L.P.A.,* and *Todd O. Rosenberg,* urging reversal for *amicus curiae* Cleveland Academy of Trial Lawyers in case Nos. 00–745 and 00–801.